# NEW YORK, LAKE ERIE & WESTERN RAILROAD COMPANY *v.* ESTILL; and *v.* LEONARD.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF MISSOURI.

No. 127. Argued February 3, 1893. — Decided March 6, 1893.

Two suits at law against a railroad company, incorporated by New York, were brought in the Circuit Court of Saline County, Missouri, by two different plaintiffs, to recover damages for injury by the company, as a common carrier, through negligence, to live cattle transported by it. The damages occurred from a collision which took place in Ohio. The cattle were being transported from Massachusetts to Missouri. The process of the court was served in St. Louis, Missouri, on a city passenger agent of the defendant, in its business office there, who had charge of it at the time, no chief officer of the defendant being found in St. Louis at the time. By a petition in each suit by the defendant, which stated that it appeared only for the purpose of making the application, the suit was removed into the Circuit Court of the United States, because of diverse citizenship. The defendant then moved in the latter court, in each suit, to quash the process on the ground that it conferred no jurisdiction on the state court over the defendant. The motion was overruled. Both cases were then tried before the same jury. In one case the verdict was for $8750 damages, and $2362.50 interest thereon at 6 per cent per annum from the time the suit was brought, and in the other case for $44,000 damages, and $11,880 interest thereon. In the first case judgment was entered for $11,112.50, with interest from the date of the verdict, and in the second case for $50,000, and like interest, the plaintiffs having voluntarily remitted $5880, because the petition claimed only $50,000 damages. There was only one bill of exceptions, covering all matters in the two suits, and one writ of error, and one citation, and one supersedeas bond, and one transcript of record. This court took cognizance of the two cases.

The state court acquired jurisdiction of the cases, under subdivision 4 of § 3489 of the Revised Statutes of Missouri of 1879, and § 3481 of the same Revised Statutes.

The cases on that subject in the courts of Missouri reviewed.

Whether the defendant waived any objection to the service of the process in the state court by appearing therein and filing a petition for the removal of the cause into the Federal court, *quære.*

A large number of the cattle being cows with unborn calves, which were lost through their premature births, caused by the collision, the defendant was liable for deterioration in the value of such cows, caused by

such abortions, although it was not shown that the defendant knew that the cows were with calf.

Detached sentences in a charge to a jury cannot be selected as grounds of objection, but must be read in connection with the whole charge.

The cases having been tried in the court below on the theory that the value of the cattle at their place of destination in Missouri was the proper basis for fixing the damages, the point that their value at the terminus in Ohio of the defendant's road was the proper basis cannot be taken for the first time in this court.

It was proper to show that some of the cattle died, or lost their calves, after their final arrival in Missouri, from the effects of the collision.

The proper rule of damages was the difference between the market value of the cattle, in the condition in which they would have arrived but for the negligence of the defendant, and their market value in the condition in which, by reason of such negligence, they did arrive.

It was not material whether the plaintiffs intended to keep the cattle upon their farms, for breeding purposes, or to sell them upon the market, the depreciation in value of the cattle being the same in either case.

The court having instructed the jury that the burden was upon the plaintiffs to show that the abortions were the direct result of the collision, and the jury having found in favor of the plaintiffs on that question, and the bill of exceptions containing all the evidence in the case on either side, and there being sufficient evidence to sustain the verdict, this court cannot review it on the weight of the evidence.

There is no ground for holding that the plaintiffs ought to have traced each animal and to have shown the amount received for it when sold.

It was improper, under the statutes of, and decisions in Missouri, for the jury to allow interest on the damages from the time suit was brought; and as the jury stated, in each verdict, the amount of interest allowed, this court reduced the judgments by striking out the interest, and ordering judgments to be entered for the amounts of the damages, with interest from the entry, and costs; the costs of this court to be paid one-half by the plaintiff in error and the other half by the defendants in error.

THE case is stated in the opinion.

Mr. *Garland Pollard* for plaintiff in error. (*Mr. Percy Werner* was with him on the brief.)

Mr. *W. M. Williams* and *Mr. John Cosgrove* for defendants in error. (*Mr. O. Guitar* and *Mr. Samuel Boyd* were with them on the brief.)

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

This is a single writ of error involving two suits, each of which was brought in the Circuit Court of Saline County, in the State of Missouri.

The first suit was commenced November 21, 1883, by Wallace Estill, Hugh W. Elliott, and William R. Estill, against the New York, Lake Erie and Western Railroad Company. The petition set forth that the plaintiffs were the owners of 70 head of polled Angus or Aberdeen cattle, imported from Scotland, and of the value of $35,000; that the cattle were intended for the Missouri market, and the defendant had full knowledge of their value and the purposes for which they were intended; that the defendant operated a railroad through the States of New York and Ohio, and was a common carrier of live stock and other freights over the line of its railroad in those States; that on or about September 12, 1883, the plaintiffs delivered to the defendant, as such common carrier, to be transported over its line of railway, the 70 head of cattle, and the defendant received them as such common carrier, well knowing their character, and the importance of transporting them with care and reasonable dispatch; that on the receipt of them, the defendant undertook and became bound to transport them safely over its railway, and to deliver them at the terminus thereof within a reasonable time; that the plaintiffs paid the usual freight and charges for transporting the cattle; that the defendant failed to transport them with reasonable dispatch and safety, but, about September 16, 1883, at Nankin, Ohio, negligently ran its train of cars, on which the cattle were being transported, into another train of cars, and by reason thereof, broke a large number of the cars in which the cattle were, threw the cattle violently against the cars and each other, and greatly jarred, bruised, maimed and injured them; that 55 of the cattle were cows in calf at the time of the accident, and about 20 of them had since the accident, and in consequence thereof, prematurely lost their calves; that the cattle were detained at the place of the accident for about 36 hours after it occurred, without suitable

food, water or attention, and in consequence were greatly reduced in value and damaged; that, in consequence of the injuries received by the cattle, the plaintiffs had been put to great trouble and expense in caring for them, and the value of the cattle had been greatly reduced; and that, by reason of the premises, the plaintiffs had sustained damages in $12,000, for which sum and costs of suit they asked judgment.

The other suit was commenced November 27, 1883, by Leverett Leonard, Charles E. Leonard, William H. Leonard and Abiel Leonard, against the same defendant, for a like cause of action. The petition contained substantially the same averments as that in the Estill suit, except that it was founded on damage to 306 head of imported polled Angus or Aberdeen and Galloway cattle, alleged to be of the value of $200,000. It averred that the defendant negligently ran the two trains, or sections of a train, upon which the cattle were being carried, into and against each other, so that about 16 of the cars, in which the cattle were at the time, were broken to pieces and demolished, and 7 of the cattle were killed or so badly injured that they were rendered worthless; and that about 250 of the cattle were cows in calf, and about 60 of them, since the accident and in consequence thereof, had prematurely lost their calves. Damages in the sum of $50,000 were alleged, and judgment was asked for that sum and costs of suit.

In each of the two cases, a writ of attachment was issued by the court to the sheriff of Saline County, and to the sheriff of the city of St. Louis, against the property of the defendant, each of which attachments contained also a direction that the sheriff summon the defendant to appear in the court, on a day specified, to answer the petition. The sheriff of the city of St. Louis made return on each of the writs issued to him, that he had executed it in the city of St. Louis, on January 7, 1884, by delivering a copy of the writ and petition to one W. E. Conner, city passenger agent of the defendant, "who was in its business office, and had charge thereof, at the time of said service," and that "the president or any other chief officer of said defendant could not be found in the city of St. Louis at the time of said service."

On the 11th of ·February, 1884, the defendant filed in the state court, in each of the two cases, a petition for the re-moval thereof to the Circuit Court of the United States for. the Western Division of the Western District of Missouri. Each petition stated that the defendant appeared " only for the purpose of making this application; " that it was a cor-poration of the State. of New York; and that the plaintiffs were, at the commencement of the suit, and still are, citizens of the state of Missouri. A proper bond was given in each case, and the state court approved the bond, granted the application, and made an order removing the cause.

A transcript of the record in each case was duly filed in the Circuit Court of the United States. The defendant then made a motion in that court, which was heard before Mr. Justice Brewer, then Circuit Judge, to quash the writ of summons issued to the sheriff of the city of St. Louis, and the return of that officer thereon, (which motion stated that the defendant appeared specially and only for the purpose of making it,) on the ground that the writ and return were void and con-ferred no jurisdiction over the defendant, because (1) being a, foreign corporation, operating a railroad in New York and Ohio, which did not terminate opposite any point in Missouri, it could not be brought into the courts of Missouri by writ of summons; (2) the cause of action sued on did not accrue in Saline County, where the suit was brought, and the business office of the defendant at the time of the alleged service was not in that county, but in the city of St. Louis; and (3) the record failed to show that at the time of the service, or at any time, the defendant was engaged in business in Missouri. The Circuit Court overruled the motion, the defendant ex-cepted to its order and decision, and the court signed and sealed a bill of exceptions setting forth those facts.

The defendant then filed an answer in each. case, denying all the allegations of the petition. A stipulation was then made and filed, entitled in both suits, that they might be trans-ferred for trial to the Eastern Division of the Western District of Missouri, and placed on the docket for trial at the next term of the court for that Division; that no question should

be raised as to the jurisdiction of the court to which the cases were to be transferred, at Jefferson City, Missouri, which could not be raised to the jurisdiction of the Circuit Court of the United States for the Western Division of the Western District; and that no question as to the jurisdiction of the latter court should be waived.

Both cases were duly tried at Jefferson City in April, 1888, before Judge Thayer, the District Judge for the Eastern District of Missouri, and the same jury. In the Estill case, the jury found the issues for the plaintiffs, and assessed their damages at $8750, and allowed interest in the sum of $2362.50, making the total damages assessed $11,112.50. In the Leonard case, the jury found the issues for the plaintiffs, and assessed their damages at $44,000, and allowed interest in the sum of $11,880, making the total damages assessed $55,880.

The defendant filed a motion for a new trial, entitled in both cases, setting forth as the grounds thereof (1) that the court gave improper instructions to the jury; (2) that it refused proper instructions asked by the defendant; (3) that it admitted improper and incompetent evidence; (4) that it made improper rulings on the evidence offered by the plaintiffs; (5) that it excluded proper and competent evidence offered by the defendant; (6) that the verdict was against the law and evidence; (7) that the damages were excessive; and (8) that the court erred in overruling the defendant's motion to quash the service of the summons in the cases. The motion for a new trial was heard before Judge Thayer, Judge Philips sitting with him; and on the 19th of November, 1888, each of the judges filed an opinion denying the motion. 41 Fed. Rep. 849, 853. On the 20th of November, 1888, an order was entered in the Estill case, overruling the motion for a new trial, and entering judgment in favor of the plaintiffs for $11,112.50, with interest at the rate of 6 per cent per annum from the date of the verdict, May 1, 1888, on the $11,112.50, until the same should be paid, and for costs. On the same day, an order was entered in the Leonard suit, stating that the plaintiffs had voluntarily remitted from the amount of their verdict $5880, so as to reduce the verdict to $50,000,

(the amount claimed in the petition,) overruling the motion for a new trial, and entering a judgment in favor of the plaintiffs for $50,000, being the damages assessed by the jury less the amount so remitted, and awarding to the plaintiffs interest at 6 per cent per annum from the date of the verdict, May 1, 1888, on the $50,000 until the same should be paid, and for costs and charges.

It was then stipulated between the parties, by a stipulation entitled in both suits and dated November 20, 1888, that one bill of exceptions, covering all matters that arose on the trial of the two causes, might answer for both; that the bill of exceptions, signed by Judges Thayer and Philips, might be incorporated in the record and used in this court as the bill of exceptions in either or both of the cases, without objections from either party; that one writ of error and one citation should be sufficient; and that one supersedeas bond might be given to cover both cases. There is one bond, reciting both judgments and referring to a single writ of error to reverse both judgments, and a single citation. There is only one citation, addressed to the plaintiffs in the two judgments, but referring to "the judgment." There is only one writ of error, but it refers to the two suits by name. The certificate of the clerk of the court below refers to the transcript as a transcript of the record and proceedings in both of the cases.

The assignment of errors is entitled in both cases, and alleges as error (1) that the Circuit Court erred in overruling the motion of the defendant to set aside the return of the sheriff on the original writs issued in the causes and to quash those writs; (2) that it erred in admitting improper and incompetent evidence offered by the plaintiffs; (3) that it erred in excluding proper and competent evidence offered by the defendant; (4) that the verdict was unsustained by the evidence; (5) that the court erred in charging the jury; (6) that it erred in refusing to charge the jury as requested by the defendant; and (7) that it erred in rendering judgments upon the verdicts in favor of the plaintiffs.

The Circuit Court (Judge Thayer) charged the jury as is set forth in the margin, the portions of the charge enclosed in

brackets, and numbered from 1 to 10, being the parts to which separately the defendant duly excepted.[1]

---

[1] In these cases there is no controversy over the fact that the respective plaintiffs delivered to the defendant certain cattle to be by it transported over its railroad and delivered at the terminus of its line to plaintiffs or to some connecting carrier. Estill and Elliott appear to have delivered to the defendant 67 head of cattle, and Leonard Bros. appear to have delivered about 306 head of cattle.

[1. Having received the cattle for the purpose of transportation, the defendant was bound to deliver the respective herds of cattle at the terminus of its line in as good condition as it received the same.] The complaint made is that defendant did not deliver the property in question at the terminus of its line in the condition that it received the same, and damages are claimed by the respective plaintiffs on that account.

It is practically admitted (and you may take it as a conceded fact) that while these two herds of cattle were in defendant's custody and in transit to their destination a collision occurred at Nankin, Ohio, between two freight trains of the defendant in which the cattle were being transported. Now, the main and about the only question you will have to consider is the nature and extent of the injuries (if any) that were sustained by the cattle immediately in consequence of the collision. When you have settled those questions you will have practically decided the case, and it is to be hoped that you will give these questions a careful and fair consideration and decide the same according to the evidence and rules of law, which I will now state for your guidance.

The law is that a common carrier like the defendant must pay the market value at the point of destination of all property entrusted to it for transportation which through its fault is lost or destroyed and is not delivered. [2. The law also is that if a carrier receives property for transportation and delivers it at the end of its route, but, through its fault, it is damaged and it fails to deliver it in the same condition as when received, it must pay the difference between the value of the property in its damaged condition at the point of destination and what the value of the property would have been at that place if delivered in the same condition as when it was received for transportation. These are the general rules of law which must be applied in the assessment of the damages in the two cases now on trial.]

[3. The testimony tends to show that seven (7) head of Leonard Bros.' cattle (5 heifers and 2 bulls) were left at Nankin, Ohio, where the collision occurred, (either killed or very badly hurt,) and were never delivered at the point of destination or at the end of defendant's line. If you find such to be the fact you will allow Leonard Bros. for those seven (7) head their market value as shown by the evidence at the point of destination in Saline County at the time they should have arrived.]

The other damages claimed by Leonard Bros. may be conveniently divided into three classes. [4. In the first place, it is contended by Leonard Bros.

The defendant asked the court to instruct the jury as follows: " (1) The jury are instructed that plaintiffs are only

---

that some of the cattle in question died after they reached the point of destination, of injuries received in the collision at Nankin, Ohio. Abiel Leonard claims that 3 Galloway bulls died from such cause on his place. William H. Leonard claims that 3 heifers died from such cause on his farm, and Leverett Leonard says that 7 heifers died on his place after their arrival. Now, if the evidence in the case satisfies you that any of the cattle did die, as stated by these witnesses, and that their death was the direct result of injuries sustained by the collision, then you will allow Leonard Bros. the market value in Saline County, as shown by the testimony, of the cattle that so died.]

[5. In the second place, it is claimed by Leonard Bros. that some of the other cattle received injuries of various kinds by the collision, which did not terminate fatally, but, nevertheless, lessened the market value of the cattle so injured. The class of injuries to which I now refer are strains, bruises, etc., which some of the cattle are said to have received. The plaintiffs themselves and Dr. Glover and Judge Sparks have spoken of about 48 head altogether that are said to have received such injuries, including no doubt, the 13 head that are said to have died. Dr. Glover and Judge Sparks say that they found 25 or 30 head of injured cows and heifers and 5 or 6 injured bulls. The plaintiffs themselves make the number of injured bulls somewhat greater. Abiel Leonard says he had 5 injured bulls in his portion of the herd. W. H. Leonard says he had 5 injured bulls in his herd. Leverett Leonard says that he had two bulls broken down in the back and loins and 8 others that were unserviceable for a year or more. You will recall their evidence on this branch of the case. I call your attention to this testimony for the purpose of saying that you should weigh it carefully and determine how many cattle, if any, received injuries by the collision of the character last described, and to what extent, if any, such injuries lessened their market value. .

If you are satisfied by the evidence that any of the cattle received injuries such as strains, bruises, etc., which rendered them less valuable in the market at the point of destination than they would have been but for such injuries, then you may allow Leonard Bros. on that account such reasonable sum as will in your judgment, under all the evidence, make good such depreciation in value.]

[6. In the third place, it is claimed that certain cows and heifers that were with calf at the time of the collision, in consequence of the collision lost their calves, and damages are claimed on that account. There is evidence tending to show that about 94 or 95 head of the Leonard Bros. cows lost their calves after the collision. Abiel Leonard says that 25 head lost their calves on his place; William H. Leonard says that 27 head lost their calves on his place; and Leverett Leonard says that 43 head lost their calves on his farm. With reference to this matter I will say that if Leonard Bros.

entitled to recover in this case such damages as they have shown by the preponderance of the evidence were the natural

---

have satisfied you by the evidence that any cows or heifers that were with calf when the collision occurred, as the direct result of that collision, lost their calves, and that such premature casting of their calves made the animals less valuable in the market than they would have been but for such loss, then they are entitled to recover the amount of the depreciation in value of any of the animals that so lost their calves.] In this connection I instruct you, however, that the burden is on them to show not only that the cattle sustained injuries, but to furnish the evidence as to the result of such injuries, and evidence that will enable you to assess the damages with reasonable accuracy. Inasmuch as the cattle came into their possession shortly after the collision, and they thereafter had the custody of the cattle, the rule should be strictly enforced requiring them to show by satisfactory evidence the nature of the injuries received, the result of the injuries, and to what extent the market value was thereby impaired.

What I have said about the assessment of damages in the case of Leonard Bros. applies equally well in the case of Estill and Elliott. This difference is to be noted in the two cases, however. None of the Estill and Elliott cattle appear to have been killed in the collision or to have subsequently died from injuries claimed to have been received in the collision. You will have no claim of that kind to consider in the Estill and Elliott case. In this case there is evidence tending to show specific injuries sustained by three bulls, one of which was injured in the testicles and two in the back or loins. W. N. Marshall and Benjamin E. Nance, who claim to have examined the Estill and Elliott cattle on their arrival, describe injuries to three bulls said to have been hurt in the back, loins, or testicles. They also say generally that from 10 to 15 cows and heifers were in very bad condition, and that one cow had lost an eye. The plaintiffs themselves have given some testimony as to the condition of their herd on arrival at Estill's. I call your attention to their testimony and ask you to consider it carefully.

[7. In the Estill and Elliott case there is also evidence tending to show that 5 of Estill and Elliott's cows aborted their calves before they reached Estill's; that 4 or 5 aborted their calves prior to October 26, 1883, when a portion of the herd was taken to Kansas City, and two afterwards, making 11 or 12 in all. With reference to these two kinds or species of injuries claimed to have been sustained by the Estill and Elliott cattle, I instruct you, as before, that if the evidence shows to your satisfaction that any of the animals sustained such injuries as the immediate result of the collision, and that the injuries so sustained lessened the market value of the stock so injured at the point of destination, then you will be authorized to allow Estill and Elliott such reasonable sum as in your opinion, under the evidence, will make good the depreciation in the value of any of the animals that you find to have been injured either by strains, bruises, etc., or by losing their calves.]

and proximate consequence of the acts complained of in the petition, and that they are not entitled to recover any damages

Now, gentlemen, on the other side of this case you have testimony of Mr. Baldwin, Mr. McCullough, and Mr. Geagan, who claim to have examined the stock of Estill and Elliott and Leonard Brothers on the 27th and 28th days of September, 1883, (11 and 12 days after the collision,) with a view of ascertaining the injuries the stock had received. I will direct your attention to the salient points of their testimony : Mr. Baldwin says that among the Estill and Elliott cattle he found, in a lot of 49 cows and calves, one or two a little lame. In another lot, consisting of two bulls and one heifer, he found the heifer had a sore foot and the bulls were a little stiff, and that one other heifer was pointed out as having lost her calf. McCullough's testimony with reference to the same herd is to the effect that he found one bull a little stiff, one (1) cow very stiff, two other bulls (one in a stable and one in a pasture) both a little stiff, and one heifer with a sore foot.

In relation to the Leonard cattle, Mr. Baldwin says he found 3 stiff or lame heifers in a herd of 35 animals; one cow a little stiff in a herd of 29 cows, and three that were said to have lost their calves; one heifer also that was said to have lost her calf; one lame cow in a herd of 30 animals; one other cow in a herd of 32 animals that was said to have lost her calf; one bull in a herd of 17, lame in the fore leg; two other bulls in a herd of (9) animals, slightly injured, one lame or stiff and one with slight flesh wound; one other bull with hoofs swollen and wound in left hind leg. Mr. McCullough's testimony as to the same herd (that is, with reference to the Leonard cattle) is to the following effect, namely, that he found 3 foot-sore heifers (one very sore) in a herd of 35 animals; 3 heifers said to have lost their calves in a herd of 29 head; 2 lame bulls in a herd of 5 animals, one footsore, and one said to be not fit to serve cows; 2 lame cows in a herd of 26 cows and calves; 1 bull noticeably lame in a herd of 17 bulls; 1 bull with a slight wound in his thigh; and one other with a slight flesh wound.

All three of these witnesses say that the injuries to the two herds were not greater or different than might be expected to result from an ordinary long railroad journey, and that none of the injuries, in their judgment, were serious or liable to produce permanent disability.

From a summary of the evidence, as I have noted it, gentlemen, the testimony for the plaintiffs tends to show that about 48 animals in Leonard Bros.' herd, (18 bulls and about 30 cows) after their arrival in Saline County, showed visible evidence of having been injured in the collision, whilst according to the evidence for defendant there were only 10 animals (5 bulls and 5 cows and heifers) which bore any visible marks of having been hurt. In the Estill and Elliott case it appears from the plaintiffs' testimony that 3 bulls and from 10 to 15 cows sustained injuries, the injuries to the bulls being of a serious character, whilst according to the testimony of defendant's witnesses only 4 animals (3 bulls and 1 cow) bore

which could have been avoided or prevented by the plaintiffs by the exercise on their part of reasonable and proper care and

---

any evidences of injuries. In the foregoing summary you will understand that I do not include cows or heifers that are said to have lost their calves. I refer only to animals that are said to have shown outward signs of injury.

[8. In the light o the testimony, both for the plaintiffs and defendant, to which I have alluded, and in the light of any other testimony in the case which you may recall, and bearing in mind that the burden of proof is on the plaintiffs to show that the cattle in question received injuries and the extent and result of such injuries, you will have to determine the following important questions of fact, namely: 1st. How many cattle in each herd were injured in any manner, in consequence of the collision, to such extent as to lessen their market value at the point of destination ? 2d. How many of Leonard Bros.' cattle were killed or badly injured and left at Nankin, Ohio, in consequence of the collision, and what would have been the value of such cattle in Saline County, at the time they should have arrived, if they had been delivered in the condition in which the defendant received them ? 3d. How many of Leonard Bros.' cattle (if any) died of injuries received by the collision after they had been delivered to Leonard Bros., and what was the reasonable market value in Saline County of those cattle if they had arrived uninjured ? 4th. How many animals in each herd lost their calves as the direct result of the collision, and to what extent did such loss of their calves lessen their market value at the point of destination ? 5th. What number of cattle in each herd, besides those that are said to have died or lost calves, were otherwise injured by the collision, by strains, bruises, etc., so as to materially lessen their market value, and what was the amount of such depreciation in value ?] To arrive at a just and intelligent verdict in these cases you will have to determine from the testimony each of the foregoing questions.

There are one or two other matters to which I will refer briefly. There is testimony in the case tending to show that in the last days of August, 1883, some of Leonard Bros.' cattle (and possibly some few of Estill and Elliott's cattle) found some Paris green and ate it at Concord, Mass. The proof tends to show that 5 head of Leonard Bros.' cattle died of poison at Concord, and that about 30 other animals were made sick by it and were treated. You will understand, of course, that if any of Leonard Bros.' cattle that are said to have died after they reached Saline County, or if any of the cows in either herd that are said to have lost their calves, died or lost calves in consequence of eating Paris green, then the railroad company is not responsible for the loss so occasioned.

There is also some testimony tending to show that when one or more cows in a herd give birth to calves prematurely, or abort, as the saying is, other cows in the same herd, unless separated from the cows that have aborted, are liable to cast their calves through sympathy or contagion, although they have themselves received no physical injury. This is a mat-

prudence. (2) The jury are further instructed that before they can allow the plaintiffs damages on account of abortions, as claimed in the petition, they must be satisfied by a preponderance of the evidence that the abortions, if any, were caused

ter that requires your attention. If it be true and you so find that cows will abort through sympathy or by contagion, then it was the plaintiffs' duty, if they could have done so, to have separated cows that had aborted from other pregnant cows, and to have done so with reasonable and ordinary diligence; and if plaintiffs failed to exercise reasonable and ordinary diligence and caution in that regard, and any cows lost their calves in consequence of such negligence, then the defendant is not liable for such losses, as they were not the immediate and direct result of the collision, but the result of plaintiffs' neglect.

I will also say that defendant cannot be held liable for losses occasioned by premature birth of calves, or by the death of stock, if such births or deaths were the result of overfeeding or the result of change of climate or fatigue or heat or of a long voyage on the ocean or by rail, or of all such causes combined. In other words, gentlemen, the defendant is only liable for such premature births and deaths as are shown by the testimony to have been directly occasioned by injuries sustained in the collision. [9. The question as to what causes led some of the animals in the two herds to lose their calves or to die after arrival is a question which you may find some difficulty in solving, as in the nature of things these are questions that do not admit of solution by positive or direct proof. I will only say that you must apply your best judgment and your experience to the solution of these questions, giving to all the testimony, including that of the experts, such weight as you think it fairly deserves.] If, upon a fair consideration of the subject, you deem the evidence insufficient to establish what was the cause of the abortions, then it will be your duty to disallow the plaintiffs' claims for damages on that account. If the evidence establishes to your satisfaction that some of the abortions were the direct result of the collision, but leaves you undecided as to the cause of other abortions, then you should allow damages for such as you are satisfied were the result of the collision and disallow the plaintiffs' claims as to the residue.

[10. When you have assessed the damages in each case you may compute interest on the damages in each case, at six (6) per cent per annum from the time suit was brought — on November 21st, 1883, in the Estill case and November 27, 1883, in the Leonard case — to this date. I will further direct you to state in your verdict the amount of interest which you award in each case.]

In conclusion, I ask you to give the cases a careful and unbiassed consideration. Consider the evidence in behalf of both parties in the same spirit of fairness that you would have it considered if you were yourselves personally interested as plaintiffs or defendants in the result of the suit.

directly by the alleged collision. (3) If the jury are satisfied by a preponderance of the evidence that the cows or heifers mentioned in the petition were with calf at the time of the collision alleged in the petition, and that some of them aborted their calves in consequence of injuries received in said collision, and that ordinary care and prudence required that such aborting cow or cows should be separated from the other pregnant cows of plaintiffs, and that this was not done, but such aborted cow or cows was or were allowed to be and remain with the other pregnant cows, by reason of which such other pregnant cows or some of them aborted their calves by contagion or sympathy, they should not allow damages for or on account of abortions thus caused by contagion or sympathy. (4) If the jury find that the plaintiffs' cows aborted their calves after the alleged collision, and that some of said abortions were caused by said collision, and that some were the result of poison, fatigue, heat, exhaustion, or any cause other than the collision, and the jury are unable to determine from the evidence which cows and how many aborted in consequence of the collision and which from other causes, they should not allow damages on account of abortion from any cause. (5) The court instructs the jury that the burden is not upon the defendants to account for the abortions amongst cows and heifers of plaintiffs, if there were such abortions, but upon the plaintiffs to prove and establish by a preponderance of the evidence that such abortions were caused by the collision alleged in the petition, and if upon all the evidence the jury are not convinced that such abortions were caused by the injury, they should not allow damages for such abortions, although they may not be able to determine from the evidence what the real cause of such abortions was. (6) The court instructs the jury that unless the defendant knew that some of the cattle of the plaintiffs were cows or heifers in calf plaintiffs are not entitled to recover for abortions, though they may have been caused by the wreck, as in that event damages on account of abortion could not have been in the contemplation of the defendant at the time the cattle were received."

The bill of exceptions states that the court refused to give

to the jury instruction (6), and that the defendant excepted to the action of the court in refusing that instruction. It is to be inferred that the court gave to the jury the other 5 instructions asked for.

The case made by the evidence is in substance as follows :' The plaintiffs bought in Scotland a large number of high-bred cattle and imported them to this country for sale for breeding purposes. Some were bulls, but the majority were heifers which were in calf at the time of the collision. The cattle were shipped from Liverpool to Boston, the ocean trip occupying twelve days. They reached Boston in good condition, and were kept for a while at Waltham, and then removed to Concord. While at Concord some of the Leonard cattle ate some Paris green, and five of them died from its effects. About thirty others were affected more or less by the poison, but after two days they were turned out with the rest of the cattle as having fully recovered. The Estill cattle did not have access to the poison, and were in a separate lot from the Leonard cattle which did. The cattle remained in Concord two or three weeks after the Paris green was eaten, and were then shipped to Missouri in good order and condition. On the journey, in Ohio, during the transportation over the railroad of the defendant, the train carrying the cattle was divided and run in two sections. On reaching Nankin, Ohio, the first section was put on one side, on a switch, and stopped ; and the second section ran into it. Several of the cars were almost demolished by the collision; some were thrown from the track ; and nine or ten of them were so badly damaged that the cattle in them had to be transferred to other cars. By the collision, some of the cattle were knocked down, the ropes by which some of them were tied were broken, and some were lying down with others standing upon them when they were found after the collision. Some were knocked against others and against the cars, and the shock of the collision was very great. The cattle were detained about thirty hours without suitable food or water. The collision occurred on a Sunday, between four and five o'clock A.M., and the train did not start west again until the

next day. The cattle were greatly bruised and injured, and the day after the collision the heifers began to abort or prematurely cast their calves. Five of them lost their calves, while on the cars, in the next two or three days; and from day to day, during the next several weeks, abortions occurred among them. The number of abortions and the character of other injuries are summarized by the court in its charge to the jury.

The evidence for the plaintiffs further showed that an ordinary railroad journey would not have caused the abortions, and that the aborting cattle were fed in the same way as those which did not abort. The plaintiffs also introduced some expert testimony to show that the abortions were the result of the collision. The testimony for the plaintiffs further showed that a cow which had once lost her calf prematurely was an uncertain breeder, and could not be sold in the market for a breeder, but was worth only what she would bring as beef; that the heifers were worth, in calf, $400 or $500 in the Missouri market, in the fall of 1883; but that a heifer which had prematurely lost her calf would not be worth more than $25 or $35, the price for beef. The evidence also stated in detail the injuries to others of the cattle and the nature thereof.

The defendant gave evidence tending to show that where one cow in a herd aborted, others would do likewise through sympathy or contagion; and that the aborted cow ought to be separated from the herd. This fact of abortion, through sympathy or contagion, was controverted by other witnesses. The plaintiffs showed that the cattle were cared for in the best manner possible. The defendant offered testimony as to the cattle that were injured and the extent of their injuries, and also examined some experts who stated that the abortions might not have been caused by the wreck.

(1) The first point urged for a reversal of the judgments is that the Circuit Court erred in overruling the defendant's motion to quash the writs issued by the state court to the sheriff of the city of St. Louis, and the returns of that sheriff thereon. It is contended that the fact that the defendant, at the time of the alleged services, had a business office in St. Louis, at which office the writs were served on its city passenger agent,

who had charge of such office at the time of the service, pre-vented it from being a non-resident of Missouri, within the meaning of the statutes of that State regulating the subject of jurisdiction and the service of process.

Writs of attachment were sued out in the suits, but no prop-erty was levied on, and hence the suits stand as if they had been instituted by summons alone. It has been held by the courts of Missouri that a non-resident corporation, which has a business office and an agent in the State, is amenable to the jurisdiction of its courts. *McNichol* v. *U. S. Mercantile Re-porting Agency*, 74 Missouri, 457. In that case, it was held that service of a summons upon a non-resident corporation, having an office or doing business in Missouri, in the manner provided by the fourth subdivision of § 3489, Revised Statutes of 1879, has the effect of personal service, and gives the court jurisdiction to enter a general judgment; and that the legis-lature had power to pass an act authorizing the service of legal process upon any non-resident corporation having an office or doing business within the State, by leaving the same with an agent of the corporation within the State, and author-izing the rendition of a general judgment upon such service.

Said § 3489 provides that a summons shall be executed, except as otherwise provided by law, in any one of six differ-ent methods specified in the section, the fourth of which reads as follows: "Or, fourth, where defendant is a corporation or joint stock company, organized under the laws of any other State or country, and having an office or doing business in this State, by delivering a copy of the writ and petition to any officer or agent of such corporation or company, in charge of any office or place of business, or if it have no office or place of business, then to any officer, agent or employé in any county where such service may be obtained."

In the case cited, the court held that the effect of the enact-ment, in 1879, of the fourth subdivision of § 3489, was to make all foreign corporations having an office and doing business in Missouri, or an agent or employé there, suable in precisely the same manner as any other defendant, by the delivery of a copy of the writ and petition, and that it must be presumed

that the legislature intended that the ordinary consequences should attend such service. See, also, *Lafayette Ins. Co.* v. *French*, 18 How. 404; *Railroad Co.* v. *Harris*, 12 Wall. 65; *Southern Pacific Co.* v. *Denton*, 146 U. S. 202, 207; *Gibbs* v. *Queen Ins. Co.*, 63 N. Y. 114; 2 Morawetz on Corporations, § 977. The principle applicable under such circumstances is that, if the corporation does business in the State, it will be presumed to have assented to the statute and will be bound accordingly.

It is contended for the defendant, however, that, as its office was in St. Louis, it was a resident of that city; and that, under the statute of Missouri fixing the place of bringing suits, it could be sued only in a court of that city. But we are of the opinion that, under the statutes of Missouri, the Circuit Court of Saline County had jurisdiction of the present suits, although the agent and business office of the defendant were in St. Louis and not in Saline County; that the service in St. Louis of the summons issued by the Circuit Court of Saline County was valid; and that the defendant was within the provisions of the Missouri statute which made non-residents suable in any county of the State.

It is provided by § 3481 of the Revised Statutes of Missouri of 1879, that suits instituted by summons shall, except as otherwise provided by law, be brought in five specified ways, the fourth of which is that "when all the defendants are non-residents of the State, suits may be brought in any county." *Farnsworth* v. *Railroad Co.*, 29 Missouri, 75; *Stone* v. *Travellers' Ins. Co.*, 78 Missouri, 655; *Swallow* v. *Duncan*, 18 Mo. App. 622; *U. S. Mutual Accident Ins. Co.* v. *Reisinger*, 43 Mo. App. 571. The defendant, by establishing its business office in Missouri, subjected itself to suit in such of the courts of the State as had jurisdiction conferred upon them, and was suable in any county in the State.

If, under § 3481, suit may be brought against non-residents in any county, regardless of the county in which the defendants may be found, it follows necessarily that the court in which the suit is brought may send its summons to the county in which service can be obtained upon such non-residents.

Otherwise, if the summons could be issued only to the county wherein the court is held, suit could only be brought in the county where the defendant could be found; which was the provision of section 5 of Article 1 of the Revised Statutes of 1845, page 805, which provision was abrogated by § 1 of Article 4 of the Session Acts of 1849, page 76, providing that if all the defendants were non-residents of Missouri, and an action would lie against them, it might be brought in any county, which latter provision was continued in § 3481 of the Revised Statutes of 1879. This construction has been held by the courts of Missouri. *Stone* v. *Travellers' Ins. Co.*, 78 Missouri, 655; *U. S. Mutual Accident Ins. Co.* v. *Reisinger*, 43 Mo. App. 571. The city of St. Louis is placed by the statutes of Missouri on the same footing as a county.

It *is* further contended by the defendant that it was a resident of the city of St. Louis within the meaning of § 3481. But the Supreme Court of Missouri has held that a foreign corporation, doing business in the State, is a non-resident, and, under § 3481, is suable in any county. *Stone* v. *Travellers' Ins. Co.*, 78 Missouri, 665, 668. It is suggested that, in that instance, the defendant was a foreign insurance corporation, and its case was provided for by § 6013, which requires foreign insurance companies, doing business in Missouri, to appoint an agent upon whom service can be made in suits against the companies, and expressly authorizes such suits to be brought in any county; and that what was said in that case about § 3481 was merely *obiter dictum.* But § 6013 does not provide as to where suits may be brought against foreign insurance companies. It merely requires them to appoint an agent upon whom service may be made, and leaves the place of instituting suits to be determined by the general law; and regulates only the manner of service. Hence, it was necessary, in the case of *Stone* v. *Travellers' Ins. Co.*, for the court to determine, as it did, whether a foreign corporation, doing business in Missouri, was to be sued as a resident or as a non-resident, under § 3481; and it was held that such a corporation was a non-resident, within the meaning of § 3481. Section 6013 in no manner interferes with § 3481.

It is quite apparent from the case of *U. S. Mutual Accident Ins. Co.* v. *Reisinger*, 43 Mo. App. 571, that the case of *Stone* v. *Travellers' Ins. Co.* was regarded as holding that, as the defendant in that case was a non-resident, suit might have been brought against it in any county.

In *Farnsworth* v. *Railroad Co.*, 29 Missouri, 75, and in *Swallow* v. *Duncan*, 18 Mo. App. 622, foreign corporations were treated as within the statutory provisions relating to non-residents. This court will adopt the construction placed upon the statutes of Missouri by the courts of that State.

The ruling of the Supreme Court of Missouri, that corporations created by other States do not become residents of Missouri by engaging in business in that State, agrees with the rulings of the Federal courts. *Ex parte Schollenberger*, 96 U. S. 369; *Myers* v. *Murray*, 43 Fed. Rep. 695.

In the cases of *Farnsworth* v. *Railroad Co.*, 29 Missouri, 75; *Robb* v. *Chicago & Alton Railroad*, 47 Missouri, 540, and *Middough* v. *St. Jos. & Denver Railroad*, 51 Missouri, 520, there is nothing which militates against the foregoing views, or which holds that corporations created by other States become residents of Missouri by engaging in business in Missouri.

Not only did Mr. Justice Brewer overrule the motion to quash the writ of summons and the return of service by the sheriff, but Judge Philips, in his opinion on the motion for a new trial, 41 Fed. Rep. 853, held that a foreign corporation, having an office in Missouri, was to be treated, under the statute, as a non-resident defendant; that the provision of subdivision 4 of § 3481 applied; and that, therefore, the suit could be brought in any county. He said that the provisions of the statute invoked by the defendant must refer, and must be limited, to domestic corporations; and he quoted a remark made by the court in *Stone* v. *Travellers' Ins. Co.*, 78 Missouri, 655, 658, that "the defendant, being a non-resident of the State, was subject to suit in any county in this State, Rev. Stats. § 3481, and could be personally served in the manner pointed out by the section under consideration," that is, § 6013.

Judge Philips remarked also that there could be no question but that, if the suit had remained in the state court, and the defendant, after moving to suppress the sheriff's return, had pleaded and gone to trial on the merits, the defective service would have been waived, citing *Kronski* v. *Railway Co.*, 77 Missouri, 362, and *Scoville* v. *Glasner*, 79 Missouri, 454, 455, and adding that, where a party had thus removed the cause into the Federal court, tried it on its merits, had one new trial, and had again tried it on the merits, in its own approved jurisdiction, it would be trifling with the administration of justice to allow it to escape judgment on the ground that it had never been in court. Judge Thayer, in his opinion, 41 Fed. Rep. 849, stated that the views of Judge Philips were in accord with his own.

We conclude, therefore, that the defendant was a non-resident of Missouri; that the suits were properly brought against it in Saline County, under § 3481; and that service of process was properly made, under subdivision 4 of § 3489.

It is insisted by the plaintiffs that the defendant waived any objection to the service of the summons, by appearing in the state court and filing petitions for the removal of the causes into the Federal court. Each of the petitions for removal states that the defendant appears "only for the purpose of making this application," and the motion made in the Federal court, to quash the writ of summons and the sheriff's return, states that the defendant appears specially and only for the purpose of making that motion. The plaintiffs cite in support of their view the cases of *West* v. *Aurora City*, 6 Wall. 139; *Bushnell* v. *Kennedy*, 9 Wall. 387; and *Sayles* v. *Northwestern Ins. Co.*, 2 Curtis, 212.

The opposing view is that the removal statute provides that, after removal, the cause shall proceed in the Federal court in the same manner as if it had been originally commenced there.

To this it is replied that the exception to jurisdiction is a personal privilege of the defendant, and may be waived; that the construction contended for would enable the non-resident

defendant to remove the suit into the Federal court, and then, by there moving to dismiss it, defeat the jurisdiction of both courts ; that the defendant is not in the Federal court against its consent, but is there by its voluntary action in view of the necessary statement in the petition for the removal that the suit is properly brought against it and is pending ; that, as the state court had jurisdiction of the subject-matter, it is too late for the defendant, after appearing to the merits, to raise an objection to personal jurisdiction ; that, although the petitions for removal state that the defendant appeared only for the purpose of making the application for removal, it could not make such application without admitting necessarily that the suit was properly pending ; and that, therefore, the special appearance reserved nothing and amounted to nothing.

We do not find it necessary to decide this point, after holding that the Circuit Court of Saline County acquired jurisdiction. There are different decisions on the question referred to in the Circuit Courts of the United States. In *New York Construction Co.* v. *Simon*, 53 Fed. Rep. 1, it was held, in the Sixth Circuit, that a defendant who removes a cause to a Federal court will not there be allowed to say that he was not properly brought before the State court, when he failed to raise that point before applying for removal. On the other hand, in the Second Circuit, in *Bentliff* v. *London & Colonial Finance Assoc'n*, 44 Fed. Rep. 667, it was held, citing several cases, that a defendant could have a suit, of which the state court acquired no jurisdiction, dismissed on that ground, even after it had been removed by the defendant to the Federal court.

(2) During the trial, on the examination, as a witness for the plaintiffs, of John Cunningham, who came with the cattle from Scotland to the United States and accompanied them on the railroad journey, he was asked: "Judging from your experience as a shipper of this class and blood of cattle from Scotland to this country, would the trip across the ocean, and detention in quarantine, and shipment by rail to Missouri, cause cows to prematurely lose their calves or abort them, if no unusual accident had occurred to them?" The defendant

objected to that question, claiming that, under the circumstances, it was not liable for abortions, and was liable for nothing except injuries to the animals; that damage from abortions was too remote; that it was something that the defendant could not anticipate or know anything about; that it was not alleged in the petitions; and that, so far, there was no proof that the defendant knew that the cattle were in calf. The court, after hearing argument, ruled as follows: "My opinion is, that if a railroad company receives a cow or any other animal for transportation that is with calf, and such animal is of greater value at the point of destination by virtue of her being in such condition than she would otherwise. be, and in the course of the journey, through the fault of the carrier, the animal receives an injury that is the direct and immediate cause of her losing her calf, that is an item of damage that is recoverable from the carrier. It stands upon the same footing as an ordinary physical injury to the animal. Of course, there may be some difficulty on both sides in proving or disproving the fact alleged that a particular injury sustained led to the loss of calves, but the fact that there is difficulty in making the proof don't alter the rule of law. The difficulty is one of fact and not a difficulty in the law. I shall allow you to proceed on both sides and try that issue of fact." The defendant then asked whether such ruling was without regard to the knowledge of the carrier. The court replied: "I don't think that has anything to do with it. The carrier had a right to make any inquiry it saw fit before it received the property, as to the condition the cows were in, and to make its arrangements accordingly. If no inquiries were made and the cattle were received, the rule stated applies." The defendant excepted to such ruling of the court. The witness answered to the question, "It would certainly not." Like rulings were made, under the objection and exception of the defendant, in regard to other questions of the same character.

We are of opinion that the evidence referred to was properly admitted, and that the above ruling of the court thereon was correct. Some remarks on the subject will be made further on.

The defendant objects to those parts of the charge of the court which are marked in brackets 1 and 2. But it is not proper to select detached sentences in the charge and predicate on them an objection. They must be read in connection with the whole charge, and for that reason we have set it forth in full. The court correctly told the jury that the defendant was liable only for the damages directly traceable to its negligence. There was nothing, in the two sentences complained of, which could have misled the jury. *Railway Co.* v. *Whitton*, 13 Wall. 270.

As to paragraph 3 in brackets, it is contended by the defendant that the court should have directed the jury that the value of the cattle when delivered at the western terminus of the railroad of the defendant, in Ohio, and not their value at the final destination of the cattle in Saline County and Howard County, Missouri, should be the basis on which to estimate the damages. But it does not appear that any such claim was made in the court below. Both parties introduced their evidence and tried the cases on the theory that the value of the cattle in Saline and Howard Counties was the proper basis for fixing the damages. No objection was made by the defendant to the evidence of value at the point of final destination, but it appears to have been conceded that it was proper to base the damages on the value of the cattle at that point. Evidence was introduced on the part of the plaintiffs, without objection, as to what the market value of the cattle would have been in the markets of Missouri, if they had arrived there in good order and condition. Various objections were made by the defendant to items in the evidence, but no objection was made on the ground that the testimony was not confined to the value of the animals at the terminus of the defendant's railroad ; and the court said : "Inasmuch as the damage complained of consisted, in part, in the fact that certain of these cattle lost their calves, it appears to me to be competent to show what the difference in value was in the fall of 1883, when these cattle arrived in Saline or Howard County, between an animal that was then with calf and liable to have a calf within the next two or three months and one

that had aborted its calf." The counsel for the defendant then said: "I concede that; unless it appears they have the power to prove its value exactly." Both parties introduced their evidence on that theory; and no question was raised about it; and it does not appear anywhere that the defendant objected to that mode of trying the cause. Neither side offered any evidence as to the value of the cattle at the terminus of the defendant's railroad. The defendant introduced its own evidence on that basis, and asked one of its witnesses what, in his opinion, was the value of the cattle on Estill's farm or at Kansas City, assuming that they were in good order, and asked another what he would say was a fair price for the cattle per head, where they were, (i.e., on Leonard's farm in Missouri,) or at Kansas City, assuming them to be in good condition and recovered from the effects of the trip. The opinions on the motion for a new trial do not show that any such question as is now made was then presented. The jury was authorized to infer from the evidence that the defendant knew that the cattle were to be transported to Missouri, and were intended for the market there.

It is further contended for the defendant that, if the proper measure of damages is the difference between the market value of the cattle, in the condition in which they would have arrived, but for the negligence of the defendant, and the condition in which they did arrive, that value must be fixed as of the time when the cattle first reached their destination, and the plaintiffs could not show that subsequently some of the cattle died. It is further contended that two rules for a recovery by the plaintiffs were adopted, first, the difference between the two market values of all the cattle, in the condition in which they arrived, and second, in addition thereto, the value of those that subsequently died.

The market value of the cattle at their destination would depend upon their condition when they reached it. Proof that the deaths subsequently resulted from injuries the cattle had received in the collision, would simply show their real condition when they reached their destination. It would not establish any new injury or any additional damage. The

plaintiffs were permitted to prove that some of the cattle had been so badly injured at the time of their delivery that they subsequently died from the effect of such injury, and, therefore, were of no value when delivered. There was, as to those animals, no double assessment of damages.

The charge of the court clearly pointed out the different items of damage. There is nothing in the record to show that the jury, under the charge, assessed the damages on the view that the value of the animals was depreciated, and afterwards allowed for the same animals on the ground that they became totally worthless. The evidence in question tended to show the condition and value of the cattle when they reached their destination. Judge Philips, in his opinion, 41 Fed. Rep. 853, 856, said: "The rule as to the measure of damages permits the plaintiff, up to the time of trial, to show the condition of the injured animal, merely as a means of ascertaining the result of the injury inflicted, so as to better enable the jury to fix the damages at the time and place of delivery. If the cows did subsequently abort, this is proof only of the extent of the injury inflicted; as much so as if they had subsequently died from the effect of the collision. The only known limit to the inquiry up to the trial is whether or not the subsequent development in the condition of the animal is traceable directly to the injury inflicted by the carrier;" citing *Kain* v. *Railroad Co.*, 29 Mo. App. 53, 61, 62, and *Sorenson* v. *Railroad Co.*, 36 Fed. Rep. 166, 167. To the same effect are *Missouri Pacific Railway* v. *Edwards*, 14 S. W. Rep. 607, and *Lake Erie & Western Railroad* v. *Rosenberg*, 31 Ill. App. 47. See also *Wilcox* v. *Plummer*, 4 Pet. 172.

The Circuit Court required the witnesses for the plaintiffs to describe the specific injuries to particular cattle, so that it might be seen that such injuries resulted from the collision, and also permitted both parties to show the condition of the animals after their arrival at their destination, in order to show how badly they were hurt by the collision.

The measure of damages was properly stated by the court in its charge to the jury. The difference between the market value of the cattle, in the condition in which they would have

arrived but for the negligence of the defendant, and their market value in the condition in which, by reason of such negligence, they did arrive, constituted the proper rule of damages. *Mobile & Montgomery Railway* v. *Jurey*, 111 U. S. 584; *Smith* v. *Griffith*, 3 Hill, 333; *Sturgess* v. *Bissell*, 46 N. Y. 462; *Cutting* v. *Grand Trunk Railway Co.*, 13 Allen, 381; *McCune* v. *Railway Co.*, 52 Iowa, 600; *Missouri Pacific Railway* v. *Fagan*, 72 Texas, 127; *Missouri Pacific Railway Co.* v. *Edwards*, 14 S. W. Rep. 607; Hutchinson on Carriers, 2d ed., §§ 221, 770a.

It was not material whether the plaintiffs intended to keep the cattle upon their farms, for breeding purposes, or to sell them upon the market. The depreciation in value of the cattle was the same in either case.

It was claimed by the plaintiffs that many of the cattle were heifers which were bred in Scotland, and were in calf when imported, and that a number of them prematurely cast their calves in consequence of the collision, and that the value of those heifers was thereby greatly depreciated. The court instructed the jury that the burden was upon the plaintiffs to show that such abortions were the direct result of the collision. The question was passed upon by the jury and found in favor of the plaintiffs; and we cannot review their verdict upon the weight of the evidence. The bill of exceptions states that it contains all the evidence offered in the case on either side, and there was sufficient evidence to sustain the finding of the jury. *Zeller* v. *Eckert*, 4 How. 289; *Express Co.* v. *Ware*, 20 Wall. 543; *Lancaster* v. *Collins*, 115 U. S. 222; *Chicago & Northwestern Railway* v. *Ohle*, 117 U. S. 123.

It was not necessary for the plaintiffs to show that the defendant had notice, at the time of the shipment, that the heifers were in calf, in order to render it liable for the depreciation in their market value, in consequence of the abortions which were caused by its negligence. It was not claimed by the plaintiffs that, on account of the heifers being with calf, any special care was necessary in transporting them; and the suits were not brought on account of the absence of any such special care. In *Hart* v. *Pennsylvania Railroad*, 112 U. S.

331, 340, it was said by this court: "As a general rule, and in the absence of fraud and imposition, a common carrier is answerable for the loss of a package of goods though he is ignorant of its contents, and though its contents are ever so valuable, if he does not make a special acceptance. This is reasonable, because he can always guard himself by a special acceptance, or by insisting on being informed of the nature and value of the articles before receiving them." See, also, *Railroad Co.* v. *Fraloff*, 100 U. S. 24; *Baldwin* v. *Liverpool & Great Western Steamship Co.*, 74 N. Y. 125; *McCune* v. *Railway Co.*, 52 Iowa, 600; *Stewart* v. *Ripon*, 38 Wisconsin, 584; 3 Sutherland on Damages, 191.

The Circuit Court gave the correct rule of damages as to the heifers which lost their calves. If, through the negligence of the defendant, the heifers lost their calves, the difference between their market value, if they had arrived in calf, and their market value after losing their calves, constituted the amount of the plaintiff's damages. *Missouri Pacific Railway* v. *Fagan*, 72 Texas, 127; *McCune* v. *Railway Co.*, 52 Iowa, 600.

There is no ground for applying a special rule to this case, or for holding that the plaintiffs ought to have traced each animal and to have shown the amount received for it when sold. The Circuit Court correctly held that it was competent for the plaintiffs to show what the difference in value was, in the fall of 1883, when the cattle arrived in Saline or Howard County, between a heifer that was then with calf, and liable to have a calf soon, and one that had lost her calf.

The plaintiffs may have received on the sale of the cattle more or less than their market value. The defendant might have brought out evidence as to what the animals were sold for by the plaintiffs; to contradict the evidence as to their market value; but the plaintiffs could not bind the defendant by the prices for which the animals were sold. The impracticability of adopting such a rule as is insisted upon by the defendant is pointed out in the opinions rendered on the motion for a new trial. Many of the cows were kept for months after their arrival in Missouri. Some of them were traded for ponies, and the ponies were sold at a loss. Others were sold

with a warranty that they would become breeders, and were afterwards taken back by the plaintiffs. Some were shipped from point to point in the West and sold. The suggested rule was, therefore, impracticable of application.

The Circuit Court refused to instruct the jury that, unless the defendant knew that some of the cattle shipped by the plaintiffs were cows or heifers in calf, the plaintiffs were not entitled to recover for abortions, although caused by the collision, as, without such knowledge, damages on account of abortions could not have been in contemplation of the defendant at the time it received the cattle. Exception was made to such refusal; but we have already remarked sufficiently on the proposition involved.

(3) The Circuit Court further instructed the jury that, when they had assessed the damages in each case, they might compute interest thereon at 6 per cent per annum, from the time suit was brought in each case, respectively; and the jury was directed to state in its verdict the amount of interest which it awarded in each case. In the Estill case, it awarded in its verdict, as interest, $2362.50, and in the Leonard case $11,880. The defendant excepted to that part of the charge which related to interest, and which is paragraph 10 contained in brackets in the margin. The defendant calls attention to the fact that interest was not claimed in the petitions, and that §§ 2126 and 2723 of the Revised Statutes of Missouri of 1879 do not, nor does any other statute of that State, authorize the recovery of interest in a suit for injury to property caused by negligence, and that the Supreme Court of Missouri has repeatedly so held. Section 2126 provides as follows: "The jury on the trial of any issue, or on any inquisition of damages, may, if they shall think fit, give damages, in the nature of interest, over and above the value of the goods at the time of the conversion or seizure." Section 2723 allows interest on moneys due on written contracts, on accounts, and sundry other money demands.

In *Kenney* v. *Hannibal & St. Jo. Railroad,* 63 Missouri, 99, in 1876, the question arose whether, in a case of the loss of property set on fire by a locomotive engine on a railroad, the

jury were authorized to allow to the plaintiff, in addition to the value of the property destroyed, damages by way of interest on its value, not exceeding 6 per cent. The court said that it was not apprised of any statutory provision which allowed a jury to give interest for such damages; that there was no such provision in the statute concerning interest; and that § 7 of the act concerning damages, which allowed interest in cases of the unlawful conversion of property by the party sued would not, in terms or by analogous reasoning, embrace a case where no benefit could possibly have accrued to the defendant by the negligence which occasioned the destruction of the property. The judgment was reversed because of the allowance of interest.

In *Marshall* v. *Schricker*, 63 Missouri, 308, in 1876, it was held that, in actions *ex delicto*, based upon the simple negligence of a party to whom no pecuniary benefit could accrue by reason of the injury thereby inflicted, interest was not allowable.

The same ruling was made in *Atkinson* v. *A. & P. Railroad*, 63 Missouri, 367, in 1876.

In *Meyer* v. *A. & P. Railroad*, 64 Missouri, 542, in 1877, which was an action for damages for the killing of a heifer through the negligence of a railroad company, the court held, citing two of the cases in 63 Missouri, and Judge Norton delivering its opinion, that the jury could not allow interest on the damages from the time they accrued.

But, in 1878, in *Dunn* v. *Hannibal & St. Jo. Railroad*, 68 Missouri, 268, in an action to recover damages against a carrier, for negligence in transporting live stock, the court below having instructed the jury to allow interest on the damages at the rate of 6 per cent. from the institution of the suit until the verdict, the Supreme Court, Judge Norton delivering the opinion, held that the instruction was proper, citing the case of *Gray* v. *Missouri River Packet Co.*, 64 Missouri, 47, 50, in which, in a case to recover damages for negligence by a common carrier in transporting an animal, the court below had directed the jury to add 6 per cent interest from the time the animal was shipped to the damages found, and the judgment

was affirmed, he himself delivering the opinion, and saying that it was a general rule, that, when goods were not delivered by a common carrier according to contract, the measure of damages was the value of the goods with interest from the day when they should have been delivered, less the freight, if unpaid. No allusion was made in either case to the cases in 63 Missouri, or to § 2126.

In *De Steiger* v. *Hannibal & St. Jo. Railroad*, 73 Missouri, 33, in 1880, while Judge Norton was still a member of the court, it was held, in a suit for the destruction of hay by fire escaping from the defendant's locomotive through its negligence, that interest was not allowable in cases of that character, citing the three cases in 63 Missouri, and the case in 64 Missouri, above referred to.

In *Wade* v. *Missouri Pacific Railway*, 78 Missouri, 362, in 1883, reference was made to the two cases to that effect in 64 Missouri, and 73 Missouri, and it was said that interest was not allowable in actions for negligence.

In *Kimes* v. *St. Louis &c. Railway*, 85 Missouri, 611, in 1885, which was an action against a railroad company for damages for negligence in killing a horse and breaking a wagon by a train of cars at a public road crossing, the court below had instructed the jury to allow six per cent interest on the damages. The Supreme Court of Missouri, delivering its opinion by Judge Norton, held that the interest was not allowable, referring to the case in 73 Missouri; but, as the plaintiff remitted the amount of the interest, the judgment was affirmed, except as to the amount remitted.

In *The State* v. *Harrington*, 44 Mo. App. 297, it was held, referring to the cases above cited from 63, 64, and 73 Missouri, that where an action *ex delicto* is based upon the simple negligence of the defendant, to whom no benefit had accrued or could accrue by reason of the injury or wrong, interest was not allowable.

It may not, perhaps, be possible to reconcile with one another all of the foregoing cases; but, on the whole, we regard it as an established rule of the Supreme Court of Missouri, in the construction of the state statutes, that the jury is

not warranted in allowing interest in a case like the present, from the time suit was brought. When property is wrongfully injured or destroyed, it is supposed that the wrongdoer derives no benefit.

The defendant cites the case of *Shockley* v. *Fischer*, 21 Mo. App. 551, as holding that interest is not allowable when it is not claimed in the petition.

It is well settled as a general rule that the measure of damages in the case of a common carrier is the value of the goods entrusted to it for transportation, with interest from the time when they ought to have been delivered. *Mobile & Montgomery Railway* v. *Jurey*, 111 U. S. 584; *Gray* v. *Missouri River Packet Co.*, 64 Missouri, 47; *Dunn* v. *Hannibal & St. Jo. Railroad*, 68 Missouri, 268; Hutchinson on Carriers, 2d ed. § 771; 1 Sutherland on Damages, 629. But when the matter appears to have been regulated by statute in the State, and the statute has been interpreted by its highest court, the regulation of the statute will be followed in the courts of the United States.

We have considered all the questions raised by the defendant, and do not think it necessary to discuss them further.

*The judgment in the Estill case is affirmed as to the $8750 damages; but it is not affirmed as to the amount of interest, or any part thereof, awarded by the verdict or judgment. That judgment is modified as to such interest, and the case is remanded to the court below, with a direction to enter a judgment for the plaintiffs for $8750, being the damages assessed by the jury, with interest on such judgment from the time it shall be entered until it shall be paid, and for the costs and charges of the plaintiffs in the Circuit Court.*

*The judgment in the Leonard case is affirmed as to the $44,000 damages; but it is not affirmed as to the amount of interest, or any part thereof, awarded by the verdict or judgment. The judgment is modified as to such interest, and the case is remanded to the court below, with a direction to enter a judgment for the plaintiffs for $44,000, being the damages assessed by the jury, with interest on such judg-*

*ment from the time it shall be entered until it shall be paid, and for the costs and charges of the plaintiffs in the Circuit Court.*

*The costs of this court, of the plaintiffs in error and the defendant in error shall be paid, one-half of them by the plaintiffs in error and the other half by the defendant in error.*