## Mueller Grain Company, Appellee, v. Lake Erie & Western Railroad Company, Appellant.

### Gen. No. 6,562.

1. CARRIERS, § 30*—*what law governs rights under contract for interstate shipment.* The rights and liabilities of a contract for an interstate shipment of grain depend upon the acts of Congress, the bill of lading, and the common-law rules as accepted and applied in federal tribunals.

2. CARRIERS, § 96*—*when negligent in accepting shipment.* A carrier is guilty of negligence in accepting a shipment when it knows, or ought to know, that it cannot handle the shipment to the destination in a reasonable time.

3. CARRIERS, § 102*—*when not relieved of duty to give notice of conditions that may cause delay in delivery.* Public knowledge of congested traffic conditions does not relieve the carrier of the duty to give actual notice to the shipper of conditions that may cause delay in delivery.

4. CARRIERS, § 102*—*when negligent in not giving notice of conditions causing delay.* A carrier which accepts a shipment of corn with knowledge of conditions causing a delay in transit, and gives no notice to the shipper that the corn cannot or may not be carried to its destination in time, is guilty of negligence, where the corn deteriorates in quality because of a delay in transit, even though the cause of the delay was something beyond its control.

5. CARRIERS, § 102*—*what is measure of damages for deterioration of corn due to unreasonable delay.* The measure of damages applied in actions for negligent injury while a consignment is in transit, which is the difference between the market value of goods at the time and place of delivery in an uninjured condition, and their value in the depreciated condition in which they were delivered, should be applied in an action to recover damages for loss in quality and quantity in corn, alleged to be due to heating and spoiling because of unreasonable delay in transit.

6. CARRIERS, § 107*—*when evidence as to grade of corn at point of shipment is inadmissible in action for damages for deterioration due to delay.* In an action against a carrier to recover damages for loss in quality of corn due to deterioration caused by delay in transit, evidence as to whether the corn raised in the district at the point of shipment the previous year in general graded a fair and average crop and that the crop of such year was one of the

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

poorest the country had produced, was properly excluded, there being no question about the grade of the corn at the point of shipment.

7. CARRIERS, § 107*—*what evidence as to cause of delay properly excluded.* In an action against a carrier to recover damages for loss in quality of corn due to deterioration caused by delay in transit, evidence that congestion in traffic caused the delay was properly excluded.

8. APPEAL AND ERROR, § 1498*—*when exclusion of evidence is harmless error.* The exclusion of proper evidence is harmless error where the fact sought to be proved is established by other evidence.

9. CARRIERS, § 110*—*when exclusion of evidence as to improvement of injured corn by treatment is proper.* In an action against a carrier to recover damages for loss in quality of corn due to deterioration caused by delay in transit, where it appeared that some of the corn was "rejected" corn, corn of the lowest grade, evidence that such corn could be made into corn of a higher grade at the point of destination was properly excluded.

10. EVIDENCE, § 93*—*how market price of property determined.* The market price of property is ascertained by evidence of what is paid and received for property when sold, if there are enough such transactions to establish a market price.

11. EVIDENCE, § 478*—*when fact not proved.* A fact cannot be regarded as proved where the evidence merely gives rise to conjecture or suspicion of its existence.

12. CARRIERS, § 106*—*when burden on plaintiff to show amount of damage due to delay.* The burden of proof to show the amount of damage is on plaintiff, in an action by a shipper against a carrier to recover damages for deterioration in quality of corn due to delay in transit.

13. CARRIERS, § 110*—*when damages for deterioration due to delay are excessive.* A verdict for $2,208.27 against a carrier for deterioration in quality of corn due to delay in transit, *held* excessive to the extent of $471.53.

Appeal from the Circuit Court of Peoria county; the Hon. JOHN M. NIEHAUS, Judge, presiding. Heard in this court at the April term, 1918. Affirmed on remittitur. Opinion filed October 10, 1918.

GRAHAM & GRAHAM and STEVENS, MILLER & ELLIOTT, for appellant; CHARLES R. WEBBER, MORRISON R. WAITE and WILLIAM A. EGGERS, of counsel.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

CLARENCE W. HEYL and HARRY C. HEYL, for appellee.

MR. JUSTICE CARNES delivered the opinion of the court.

This is one of four appeals by defendants in cases tried at the same term of the Peoria county Circuit Court before the same judge, presenting here, with slight exceptions, the same questions of law, with briefs of counsel substantially and in part literally the same. It is an action on the case brought by the Mueller Grain Company, the appellee, against the appellant railroad company, the initial carrier, to recover damages for loss in quality and quantity in five carloads of corn shipped from Peoria, Illinois, to Baltimore, Maryland, which damage it is charged was caused by the negligence of the carrier in holding the grain in transit an unreasonable time and until, in the warm weather of the spring season, it heated and spoiled.

The declaration contained counts on each of the five cars charging deterioration in quality, and a count on the entire shipment charging both loss in quantity and damage to the remainder. The general issue was pleaded. There was a verdict of $2,208.27 for the plaintiff, which could only be reached by allowing for loss in weight at 81 cents a bushel, and for the remaining corn a damage in quality of 33 cents per bushel. Appellee in its brief claims the result of that computation is $2,218.93. Appellant does not deny that the sum named in the verdict would be obtained on that basis, and though appellee does not state its computation in detail and we fail to get its exact result, the verdict is not substantially excessive if appellee's theory of the case is adopted.

Appellant's motion for a new trial was denied and judgment entered on the verdict. A reversal is asked because appellant says: (1) It was not an insurer of

prompt delivery, and is only liable for unreasonable delay under the circumstances of this case, and that the unusual delay was caused by conditions incident to the war and entirely beyond its control; (2) that the rule of damages adopted was the difference in the market value at the time and place of actual delivery, while it claims the true measure of damages is the difference in the market value of the corn at the time and in the condition in which it did arrive, and at the time and in the condition in which it should have arrived, and that there is no evidence of market price at the time the corn should have arrived, therefore no basis for a verdict in any amount of damages; (3) that the court erred in excluding evidence offered by appellant that the damage was caused by too much moisture in the corn at the time of delivery to the carrier; (4) that the court erred in excluding evidence of the condition causing the delay in transit; and (5) that the corn was delivered in as good condition as when received, or at most it was not damaged more than 22 cents a bushel. No complaint is made of the instructions to the jury, and none as to rulings on evidence except these general statements. It is not suggested that there was any stipulation in the bill of lading limiting or restricting the carrier's liability.

The shipment, being interstate, the rights and liabilities of the parties depend upon acts of Congress, the bill of lading, and common-law rules as accepted and applied in federal tribunals. *Adams Exp. Co. v. Croninger,* 226 U. S. 491; *Southern Ry. v. Prescott,* 240 U. S. 633; *Cincinnati, N. O. & T. P. Ry. Co. v. Rankin,* 241 U. S. 319; *Gulf, C. & S. F. Ry. Co. v. Texas Packing Co.,* 244 U. S. 31; and *Michelson v. Judson Freight Forwarding Co.,* 268 Ill. 546. The federal statute governing is the Interstate Commerce Act as changed by the Cummins Amendment, which amendment took effect in June, 1915, and unaffected by the subsequent amendment of August 9, 1916, after

this cause of action accrued. There are many federal and State decisions based on the provisions of the Carmack Amendment (Act of June 29, 1906, 34 U. S. St. 593, 594); see also Fed. St. Ann. vol. 4, sec. 506 *et seq.* The Carmack Amendment as enacted is copied in 10 Corpus Juris, 136, n.39; and the Cummins Amendment on the next page, n.48. The effect of those amendments is discussed in that work, beginning on page 52 of that volume.

The evidence shows without contradiction that February 4, 1916, appellee delivered to the appellant at Peoria, Illinois, five carloads of corn, aggregate weight 348,000 pounds, to be shipped to Baltimore, Maryland. The corn was 77 days in transit, delivered at Baltimore April 22, 1916, where the total weight was 330,070 pounds, a shrinkage of 17,930 pounds. At the time of shipment at Peoria one car of the corn graded No. 4, and each of the other four cars No. 5. On delivery at Baltimore it all graded "rejected corn, very damp, musty, moldy, warm, and damaged." Different terms were in use at Peoria and Baltimore to express the condition of corn. The highest grade at Baltimore was known as "contract corn" or "prime sail corn," meaning the same, and applied to corn fit for shipment in sailing vessels. The next lower grade was termed "steamer corn," applied to corn that should be carried in steamers. Then followed the lower grade of "N. E. G." or "no established grade," then the lowest "rejected corn," applied to corn that would not take either of the higher grades and including different qualities of damaged grain. At Peoria numerals were used to denote the relative quality of grain. The classification at the two places was not governed by precisely the same considerations, but the amount of moisture in the corn was at each place the most important factor.

When this corn was delivered at Baltimore April 22,

1916, the quoted and admitted market price there of contract or prime sail corn was 81 cents per bushel; of steamer corn 3 cents less, or 78 cents a bushel. There was no quoted market price for the grade "rejected," but there was a market there for it at a discount of from 25 cents to 33 cents a bushel from the quoted price of contract corn, depending upon its condition. Without seeing the corn, and judging only from its grade "rejected," it could only be said, if it was the worst included in that classification, the discount would be 33 cents, and if the best, 25 cents a bushel; or if, of an intermediate quality, then some intermediate figure, which could only be ascertained by further information than the word "rejected," and its following words in the reported grade furnished.

Witnesses for appellee testified that the customary time for transit between Peoria and Baltimore was 8 to 12 days. A witness for appellant said, under ordinary conditions, if the shipment left Peoria on or about February 4th, the corn should have arrived at Baltimore by March 1st. It appears without much, if any, contradiction that had the corn arrived at Baltimore in February, whether 10 or 25 days in transit, it would not, in the cool weather of that month, have become heated and damaged, but in the warm weather following, the germinating period occurs, and corn retained in closed cars, as was this corn until April 22nd, would naturally heat and depreciate in quality and value. We think it conclusively proven that the corn was much damaged and depreciated in market value while in transit, and that the unusual delay and holding the grain in closed cars so long in the warm spring weather was the proximate cause of the injury.

This brings us to a consideration of the question of law presented by appellant's counsel. In support of the first, that a carrier is not an insurer of prompt delivery, they cite 10 Corpus Juris, 290. It is there said in the text, section 410: "A carrier may excuse

its delay by accident or misfortune, although not inevitable or produced by an act of God." But on the same page, section 412, we find:

"Where goods are tendered to a carrier for transportation, it is bound to advise the shipper as to any cause likely to delay transportation, which cause is within its knowledge, or within its fair and reasonable means of knowledge, and not within the knowledge of the shipper; and, if it fails in its duty in this respect, a delay in the transportation of the goods will not be excused, and that too irrespective of the nature of the cause. The acceptance of goods for shipment without notifying the shipper of the fact that they cannot be promptly delivered is tantamount to an assurance that they will be delivered within a reasonable time, except for the intervening of excusing causes of subsequent occurrence. This duty is in no way dependent on special agreement, but is a part of the duty imposed by law on carriers; and the reason why the law has imposed it on the carrier is to give the shipper an opportunity to exercise his own discretion as to the propriety of making the shipment—to choose between the different courses open to him."

They refer us to 24 L. R. A. (N. S.) 1209, where we find a case and note collecting authorities in support of the proposition that unusual heavy snowstorms which tie up railroad operations, obstructing movements of trains, are to be held acts of God, relieving common carriers from liability for loss caused thereby. Several other authorities are cited to the effect that delay in transit from causes beyond the control of the carrier may be excused. All cases bearing on this and other questions presented here should be read, observing the distinction between the liability of the carrier as an insurer and its liability for loss resulting from its own wrongful or negligent act. The general rule applicable to the facts in this case is as stated in *Tate v. Missouri Pac. Ry. Co.*, 157 Ill. App. 105, 110, in an opinion by Justice Duncan, that a carrier is guilty of negligence in accepting a shipment

when it knows, or ought to know, that it cannot handle it to its destination in a reasonable time. *Eastern Ry. Co. of New Mexico v. Littlefield*, 237 U. S. 140, is conclusive on this question. The contention of appellant on this point is practically the same as that of counsel in *Conover v. Wabash Ry. Co.*, 208 Ill. App. 105, where it was denied on the authority of that federal case and other cases. It is not claimed that appellant notified appellee at the time of shipment that there would or might be delay in delivery, or that appellee was in any way charged with that knowledge; therefore the question whether public knowledge of congested traffic conditions at the time might affect the rights of the parties is not presented; but such public knowledge does not relieve the carrier of the duty to give actual notice to the shipper of conditions that may cause delay in delivery. *Missouri, K. & T. Ry. Co. of Texas v. Stark Grain Co.*, 103 Tex. 542, 131 S. W. 410; *Conover v. Wabash Ry. Co., supra.* The record before us presents a case charging appellant when it accepted the corn with knowledge of the conditions causing the delay in transit, and no notice to appellee that the grain could not or might not be carried to its destination in the usual time required for such transportation. We conclude appellant was guilty of negligence even if it be considered that the cause of delay was something beyond its control.

Appellant's second contention is that the damage, if any, should be ascertained by application of the rule established in actions for loss from unreasonably delayed shipments, which is the difference between the market value of the consignment at the *time* and in the condition it should have arrived, and its market value at the *time* and in the condition when it did arrive, instead of the other rule applied in actions for negligent injury while the consignment is in transit, which is the difference between the market value of the goods at the *time* and place of delivery in an uninjured con-

dition, and their value in the depreciated condition in which they were delivered. There are minor considerations to be noted in a general application of each of the above rules, but the statement is sufficient to present the question of time at which values are to be ascertained. The court gave for appellant an instruction stating the law as it now contends, but the jury could only have reached the verdict by adopting the other rule. In actions for damaged goods the rule, as above stated, is held in *New York, L. E. & W. R. Co. v. Estill*, 147 U. S. 591; *Gulf, C. & S. F. Ry. Co. v. Texas Packing Co., supra;* and in *Wabash R. Co. v. Campbell*, 219 Ill. 312; and so stated, citing many cases, in 10 Cyc. 396. In actions for unreasonable delay, the rule, as above, is stated in 6 Cyc. 450, citing many cases, among them *Illinois Cent. R. Co. v. Cobb, Blaisedell & Co.*, 72 Ill. 148. It was so held in Illinois as early as *Sangamon & M. R. Co. v. Henry*, 14 Ill. 156. Authorities are numerous and practically uniform, in the application of the above-stated rules to claims for unreasonable delay in delivery, and claims for damaged goods, respectively. In the present case, if the rule of delayed shipment is applied, there is no evidence to support the verdict because no proof of market value at the time the corn should have arrived, and if there was such evidence it might be, as appellant's counsel say it would be, proof of a rise in market value, which they claim the carrier is entitled to the benefit of in assessing damages, and which he would get if the rule of delayed delivery is applied.

We regard this as an action for negligence, in permitting goods to become damaged, as distinguished from an action for unreasonable delay. The delay is only pleaded and proven to show why the corn became hot and rotten, but in a sense the damage was occasioned by unreasonable delay in transportation. Is the carrier's liability different from what it would be had it delivered the goods in a reasonable time, dam-

aged from some other wrongful act, is the question presented. Cases are not numerous where delay in transit and damaged goods are both charged. Appellant's counsel cite only *Idaho Sheep Co. v. Oregon Short Line R. Co.*, 188 Ill. App. 591, and *Warren Land Co. v. Chicago, St. Paul, M. & O. Ry. Co.*, 195 Ill. App. 157, in support of their contention. We find in the text of 10 Corpus Juris, sec. 442: "If during the negligent delay the market price at destination increases, the shipper is not injured and is not entitled to recover damages," citing only *Stevens v. St. Louis Southwestern Ry. Co.* (Tex. Civ. App.), 178 S. W. 810, in support of the text. That case announces that rule without citing any authority. The statement is correct if confined to actions for unreasonable delay.

This court in *Michigan Cent. Ry. Co. v. Osmus*, 129 Ill. App. 79, passed on a case much like the present where there was injury to live stock caused by unreasonable delay in transportation, and held that the rule applicable to damaged property applied. At first blush it may seem plausible that the shipper should only be reimbursed his pecuniary loss, and if the market has gone up enough to make good the damage to goods by his wrongful act then there should be no recovery; but there is abundant reason and authority denying that position. If appellant had negligently destroyed one carload of this corn, or 10 per cent of the corn in each car, it could not escape the penalty of its own negligence by showing a benefit to the shipper from a rising market while the carrier wrongfully delayed the delivery of the goods. The precise question was decided in *Morrison v. I. & V. Florio S. S. Co.*, 36 Fed. 569, where it was held that the carrier could not escape liability by reason of the advance in price in the interval between the dates of required and actual delivery, and said on page 571: "The profit accruing from the accidental rise in the market belonged to the libelant, and it would be an extraordi-

nary misapplication of the principles of justice to allow the respondents to escape all liability for their negligence and dereliction of duty by depriving the libelant of any recompense for their wrong because of the advance in price. To do this would be to bestow a premium on the misconduct of the respondents.'' And suggested that in the case there considered (damage to 600 casks of prunes), if the price had doubled between the day when they should have been delivered and the day of actual delivery, and 300 casks had been delivered sound and the other 300 were totally destroyed by the fault of the carrier, that the shipowner could not claim that the doubling of the market price had relieved him from payment for the half destroyed. This case is cited and the rule there stated adopted in the text of the' third edition of Sutherland on Damages, sec. 906, and repeated with additional citation of authorities in the fourth revised edition of that work, same section. The question was presented in *Conover v. Wabash Ry. Co., supra,* and the court on the authority of *Morrison v. I. & V. Florio S. S. Co., supra,* and Sedgwick on Damages, p. 1763, held that: ''The carrier cannot be exempted from the consequences of his own wrong by an advance in price during the wrongful delay in transit.'' We conclude the proper rule of damages was applied in reaching the verdict.

The third and fourth points made by appellant are on the exclusion of evidence. There is no reference to the abstract or record to indicate the items claimed to be erroneously excluded. We notice in examining the record that the court sustained objections to questions whether the corn in the Springfield and Decatur districts that year, in general, graded a fair and average crop, and excluded a statement that the crop of corn in 1915 was one of the poorest this country had produced, especially from the section including Peoria. We see no error in that. There was no question about

the grade of the corn at Peoria. Full inquiry was permitted as to what those grades, 4 and 5, meant. If there had been no other corn in the district that would take that grade, that fact would not be material unless possibly in some action in which the correctness of the grade was questioned. The court did reject some evidence as to the cause of the delay in transit, but that was all directed to the fact that congestion of traffic caused the delay. This ruling was correct because that cause of delay did not excuse the carrier, as we have before said. And if it had been competent, appellant was not harmed because there was evidence admitted showing that the cause of delay was congestion in traffic, on which evidence counsel here base a part of their argument. It appears that "rejected" corn could be made "prime sail" corn by a drying process in use at Baltimore. Appellant offered to show the weight of the corn after it had been submitted to that treatment. This evidence was rejected. At most it could only have tended to show that the corn was the best quality included in the grade "rejected." "Rejected" corn was something distinct from "prime sail" corn in the sense that corn meal is different from corn, and on the question of market price, when there is one, the court cannot go into an inquiry of the cost or result in value from converting a lower into a higher grade, or into meal or bread, or feeding it to stock. All these considerations are presumed to be involved in and govern the market price, which is ascertained by evidence of what is paid and received for property when sold, if there are enough such transactions to establish a market price.

Appellant's fifth and last contention is that the corn in its condition at Peoria would not have graded higher than steamer corn at Baltimore because of the amount of moisture shown by the grade at Peoria, and therefore the price of steamer corn, 78 cents, should have been used instead of the price of "prime sail"

corn, 81 cents. There is some evidence supporting that contention, but more evidence that it would have taken the higher grade. We would not be justified in rejecting the verdict of the jury on that question. But appellant also says "rejected" corn was at a discount of from 25 cents to 33 cents a bushel, and there was no other evidence as to the market value of this corn on its arrival at Baltimore; therefore, as the burden is on appellee to prove the amount of damage, it can recover only on the basis of 25 cents a bushel discount. Appellee's counsel do not answer this suggestion. Appellant cites no authority. Probably this damage was somewhere between the two extremes. There was more reason for choosing some intermediate figure, but such a verdict would have rested on a guess. We know of no authority permitting this extreme verdict, because the action is one of tort instead of contract. In Sutherland on Damages, vol. 1, sec. 100, it is noted that in cases of fraud and intentional wrong compensatory damages are given with a more liberal hand by juries, and their verdict is less closely scanned by courts, and perhaps remote and uncertain damages are less strictly excluded, but it is said: "Where the damages are certain, as for the taking or destruction of property having a well-known and provable value, the rule of compensation is generally the same, whether the loss is by tort or by breach of contract, and whether the wrong was wilful or not. But there is a more liberal allowance of damages where the tort is an aggressive one, and the entire damages, or some part of them, are not capable of measurement by some standard of value or definite rule." The general rule is that a fact cannot be regarded as proved where the evidence merely gives rise to conjecture or suspicion of its existence. 17 Cyc. 754. A majority of chances never can suffice alone to establish a proposition of fact. 17 Cyc. 764.

Appellee had the burden of proving the amount of

the damage. This corn was damaged so that it graded "rejected." Whether the best, or the worst or some intermediate quality of "rejected" corn, was capable of proof. We conclude that under the evidence the verdict should have been based on a damage of 25 cents instead of 33 cents a bushel difference between price of "prime sail" and "rejected" corn. This computation reduces the verdict $471.53.

This opinion will be lodged with the clerk of the court and if appellee files a remittitur within 5 days in the sum of $471.53, the judgment will be affirmed in the sum of $1,736.74 at appellee's costs; otherwise the judgment will be reversed and the cause remanded.

*Affirmed on remittitur.*

MR. JUSTICE NIEHAUS took no part.

Appellee having filed herein a remittitur in the sum of $471.53, the judgment is therefore affirmed in the sum of $1,736.74 at appellee's costs.