Cheryl Maloof JOHANSEN, Mildred D. Goldman, et al., Plaintiffs-Appellees, Cross-Appellants,

Aubrey G. McGill, William E. Jones, Raymond H. Jones, Martha Jones Long, et al., Plaintiffs,

v.

COMBUSTION ENGINEERING, INC., Defendant-Appellant, Cross-Appellee.

No. 97-8726.

United States Court of Appeals,

Eleventh Circuit.

April 1, 1999.

Appeals from the United States District Court for the Southern District of Georgia. (No. CV 191-178), Dudley H. Bowen, Jr., Judge.

Before ANDERSON and BARKETT, Circuit Judges, and HILL, Senior Circuit Judge.

HILL, Senior Circuit Judge:

Property owners brought a nuisance and trespass action against the present owner of a former mining site, Combustion Engineering, Inc. ("CE"), alleging that acidic water had escaped from the site, damaging streams that run through their properties. The jury awarded the owners an aggregate of $47,000 in compensatory damages and $45 million in punitive damages which the district court reduced to $4.35 million. All parties have appealed.

I.

In the 1920's, a company named Tiffany's mined a site in Lincoln County, Georgia for rutile, a substance used for polishing diamonds. At some point thereafter, Aluminum Silicates, Inc. began mining the site for kyanite, a mineral used to make heat-resistant products. In the mid-1960's, CE purchased the site and began mining kyanite.[1] It conducted these mining operations until 1984, when it sold the property to Pasco Mining Company ("Pasco"). Pasco operated the mine site until November 1, 1986, at which time Pasco

---

[1]Actually, a company named Combustion Chemical, Inc. was formed to purchase the site and do the mining, but this company was at all times a wholly-owned subsidiary of CE.

defaulted on its obligations and the facility and all environmental responsibilities for the property reverted to CE pursuant to the parties' 1984 contract. CE never resumed mining operations.

At the time the mining originally began, Graves Mountain was essentially a big, solid rock. The mine operator would remove, crush, and process the rock in order to extract the kyanite. After the removal of the kyanite, the remaining crushed rock, or "tailings," would be deposited into containment areas, known as "tailings ponds." One of the minerals in the tailings was pyrite. When rainwater falls on pyrite that has been exposed to oxygen, a chemical reaction takes place that renders the water more acidic. Periodically, acidic water from the mining site seeped into streams that flowed through CE's property affecting their quality as they ran through the properties downstream.

In August of 1991, several individuals who owned a total of sixteen tracts downstream from the mine site sued CE claiming damages for trespass and nuisance. Several other property owners filed suit in May of 1992, and the two suits were consolidated. Property owners' claim was that the streams looked and smelled bad, that the streams no longer contained fish, and that cows would not drink from the streams. They did not allege any personal injuries, risk to human health, diminution in property value, damage to crops or animals, or any other economic loss.[2]

The case was tried to a jury in a two-phase trial in which issues relating to punitive damages were decided separately from liability for the underlying torts and compensatory damages. The jury was instructed that the relevant time frame for damages purposes was the four-year period prior to the commencement of the property owners' suit.[3]

---

[2]Few of these individuals live on their property. Some do not use their property at all, and several others have been to their property (or the streams on it) only rarely if at all over the past several years. The plaintiffs who do use their property, do so for raising cattle, storing junked cars, hunting, timbering, or growing hay.

[3]Georgia has a four-year statute of limitations for trespass and nuisance.

2

In the first phase of the trial, the jury returned a total of thirteen verdicts for compensatory damages in favor of the various property owners in an aggregate amount of $47,000. The thirteen verdicts ranged from $1000 to $10,000. The jury also awarded property owners litigation costs in the amount of $227,000.

In the punitive damages phase of the trial, property owners were required as a matter of Georgia law to prove by clear and convincing evidence that CE's actions "showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5(b). To recover more than $250,000 each, property owners were required to demonstrate, again by clear and convincing evidence, that CE acted "with the specific intent to cause harm." *Id.* at § 51-12-5.1(f). The jury awarded $3 million in punitive damages to each of the fifteen property owners who owned the sixteen parcels of land at issue, for a total of $45 million.

The district court found this amount "shocking," which if allowed to stand would "give[ ] the system a black eye." The court entered an order granting CE's motion for a new trial unless property owners agreed to remit all punitive damages over $15 million. Property owners agreed to do so and the court entered separate judgments totaling $15 million in punitive damages.

CE appealed to this court. During the pendency of the appeal, CE settled with three property owners, leaving an aggregate of $43,500 in compensatory damages and $12 million in punitive damages at issue in the appeal. After oral argument, we affirmed those judgments without opinion. *Johansen v. Combustion Engineering, Inc.,* 67 F.3d 314 (11th Cir.1995).

CE petitioned the Supreme Court for certiorari, contending that the punitive damage award was still excessive. The Supreme Court deferred ruling on CE's petition pending its resolution of *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). After it ruled that the Constitution does not permit "excessive" punitive damage awards, the Court granted CE's petition, vacated this court's judgment, and remanded the case to us for further consideration in light of *BMW*.

3

We remanded the case to the district court.  The district court reexamined the punitive award under *BMW,* and concluded that the Constitution would permit punitive damages in an amount no more than 100 times each plaintiff's compensatory award.  Therefore, he ordered the entry of judgment for each of the remaining plaintiffs in an amount equal to the jury's compensatory award plus 100 times that amount as punitive damages.  This resulted in an aggregate punitive damage award of $4.35 million.  The district court did not afford property owners the opportunity to elect a new trial.

CE appealed, arguing that even $4.35 million in punitive damages is unconstitutionally excessive on the facts of this case.  CE also contends that the district court erred in not offsetting the punitive damage award by the amounts it had already paid some of the property owners in settlement.

Property owners cross-appealed arguing that the district court erred in holding that the $15 million punitive damages award was unconstitutionally excessive.  They seek restitution of the district court's remittitur of $15 million which they accepted in lieu of a new trial.  They also argue that the district court erred in ordering post-judgment interest to run from the date of the second rather than the first judgment.

 Finally, property owners claim that the district court committed constitutional error when it reduced the jury's punitive damage verdicts to $4.35 million and unilaterally entered judgments totaling that amount.  Although they do not analyze it as such, this claim raises a jurisdictional issue of first impression which we must resolve prior to proceeding to the merits of this appeal.[4]

II.

---

[4]A federal court not only has the power but also the obligation at any time to inquire into jurisdiction whenever the possibility that jurisdiction does not exist arises. *Philbrook v. Glodgett,* 421 U.S. 707, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975); *Blue Cross & Blue Shield v. Sanders,* 138 F.3d 1347, 1351 (11th Cir.1998).  "We always must investigate questions of subject matter jurisdiction, whether or not they are raised by the parties to the case." *Reahard v, Lee County,* 978 F.2d 1212, 1213 (11th Cir.1992) (quoting *Fitzgerald v. Seaboard System R.R.,* 760 F.2d 1249, 1251 (11th Cir.1985)). *See also* Rule 12(h)(3), Fed.R.Civ.P., ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

A federal court has no general authority to reduce the amount of a jury's verdict. *Kennon v. Gilmer,* 131 U.S. 22, 29, 9 S.Ct. 696, 33 L.Ed. 110 (1889). The Seventh Amendment prohibits re-examination of a jury's determination of the facts, which includes its assessment of the extent of plaintiff's injury. *Id.* A federal court may not, therefore, "according to its own estimate of the amount of damages which the plaintiff ought to have recovered, ... enter an absolute judgment for any other sum than that assessed by the jury." *Id.* at 30, 9 S.Ct. 696.[5] To do so would deprive the parties of their constitutional right to a jury. *Id.*

A district court may, however, order a new trial.[6] The authority to do this is located in the common-law principle, later codified in the Judiciary Act of 1789, that "[t]rials by jury in civil causes could not subsist now without a power, somewhere, to grant new trial.... It is absolutely necessary to justice, that there should, upon many occasions, be opportunities of reconsidering the cause by a new trial." *Bright v. Eynon,* 1 Burr. 390, 393 (K.B. 1757) (Lord Mansfield) (quoted by Judge John J. Parker in *Aetna Cas. & Sur. Company v. Yeatts,* 122 F.2d 350, 353-54 (4th Cir.1941)).[7] Therefore, when a court finds that a jury's award of damages is excessive, it may grant the defendant a new trial.[8] *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 433, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996).

A federal court's power to "order" a remittitur grew out of this authority to grant a new trial. A court which believes the jury's verdict is excessive may order a new trial unless the plaintiff agrees to remit a

---

[5]The Seventh Amendment applies only to the federal courts. *Minneapolis & St. L. R.R. v. Bombolis,* 241 U.S. 211, 217, 36 S.Ct. 595, 60 L.Ed. 961 (1916); *Woods v. Holy Cross Hosp.,* 591 F.2d 1164, 1172 (5th Cir.1979).

[6]A court may also order a new trial limited to the issue of damages. *Kemp v. Balboa,* 23 F.3d 211 (8th Cir.1994); *Mason v. Texaco, Inc.,* 948 F.2d 1546, 1552 (10th Cir.1991).

[7]The court's power to order a new trial is recognized in Rule 59(a), Fed.R.Civ.P.:

> A court may grant a new trial for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

[8]This is merely a special application of the general power of the trial court to set aside a verdict that is against the weight of the evidence. *Greyhound Corp. v. Dewey,* 240 F.2d 899 (5th Cir.1957).

portion of the jury's award. *Dimick v. Schiedt,* 293 U.S. 474, 486-87, 55 S.Ct. 296, 79 L.Ed. 603 (1935). This practice dates from Justice Story's opinion in *Blunt v. Little,* 3 F.Cas. 760, 761-62 (No. 1578) (C.C.D.Mass.1822) (Story, J.), in which he announced that, because the verdict was not supported by the evidence, unless the plaintiff was willing to remit $500 of his damages, the cause would be submitted to another jury. Although Justice Story cited no authority whatever, the Supreme Court has "never expressed doubt with respect to this rule." *Dimick,* 293 U.S. at 486, 55 S.Ct. 296. *See e.g., Linn v. United Plant Guard Workers of America, Local 114,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966); *Arkansas Valley Land & Cattle Co. v. Mann,* 130 U.S. 69, 9 S.Ct. 458, 32 L.Ed. 854 (1889); *Northern Pac. R. Co. v. Herbert,* 116 U.S. 642, 646-47, 6 S.Ct. 590, 29 L.Ed. 755 (1886).

The Seventh Amendment requires, however, that the plaintiff be given the option of a new trial in lieu of remitting a portion of the jury's award. *Hetzel v. Prince William County, Va.,* 523 U.S. 208, 118 S.Ct. 1210, 1211, 140 L.Ed.2d 336 (1998). In *Hetzel,* the Supreme Court reversed the Fourth Circuit's mandamus to the district court to enter judgment for a remittitur without affording the plaintiff the option of electing a new trial. The Court expressly held that no judgment for a remittitur may be entered without the plaintiff's consent because the Seventh Amendment prohibits the court from substituting its judgment for that of the jury's regarding any issue of fact. *Id.* at 1212. *See also Dimick,* 293 U.S. at 474, 55 S.Ct. 296; *Gasperini,* 518 U.S. at 433, 116 S.Ct. 2211. If the plaintiff does not consent to the remittitur, the court has no alternative but to order a new trial. *Id.*

In this case, however, that did not happen. This reduction was neither consented to nor rejected in favor of a new trial. Rather, the district court entered reduced judgments totaling $4.35 million in punitive damages, without seeking property owners' consent nor affording them the option of electing a new trial.

Although they now claim the district court abridged their Seventh Amendment right to a jury, property owners did not bring this "error" to the district court's attention. Instead, they filed a notice of appeal

6

of the reduced judgments. In their initial briefs, each claims the right to elect a new trial, should they so desire, after we decide this appeal.[9] This possibility caused us to reflect on the procedural posture of this case.

Prior to *BMW,* if a district court ordered a remittitur, a plaintiff had two choices. He could invoke his Seventh Amendment right to reject the district court's reexamination of the jury's verdict (the remittitur) and elect a new trial, or he could consent to the remittitur. *Neither of these two choices, however, was appealable.*

A district court's grant of a new trial is not appealable.[10] *Allied Chemical Corp. v. Daiflon, Inc.,* 449 U.S. 33, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980). Such an order is merely interlocutory and is not appealable under the final judgment statute invoked by property owners as the basis for this appeal. *Id. See also* 28 U.S.C. § 1291. Therefore, if property owners had been afforded the opportunity to reject the reduced awards and had elected a new trial, the district court would have granted CE's motion for a new trial and this order would not have been appealable.[11] *Seltzner v. RDK Corp.,* 756 F.2d 51 (7th Cir.1985); *Continental Trend Resources, Inc. v. Oxy USA, Inc.,* 810 F.Supp. 1520, 1523 (W.D.Okla.1992).

---

[9]Both parties assume that property owners had a constitutional right to elect a new trial after the second "remittitur." Defendants concede this point, however, only if property owners must make that election prior to our resolution of this appeal.

[10]The only exception would be where the district court was without the power to grant the motion, as, for example, where the motion was untimely. *See Phillips v. Negley,* 117 U.S. 665, 6 S.Ct. 901, 29 L.Ed. 1013 (1886).

[11]It is *reviewable,* however, on appeal of the final judgment entered after the second trial. If the appellate court agrees, it will reinstate the verdict reached at the first trial. *Conway v. Chemical Leaman Tank Lines, Inc.,* 610 F.2d 360 (5th Cir.1980).

Neither could property owners have appealed if they had accepted the reductions.[12] *Donovan v. Penn Shipping Co., Inc.,* 429 U.S. 648, 649, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977). Although for some years there was authority, especially in the Fifth Circuit, that a plaintiff who consents to a remittitur "under protest" may challenge on appeal of the final judgment the correctness of the remittitur order, *United States v. 1160.96 Acres of Land,* 432 F.2d 910 (5th Cir.1970), in *Donovan,* the Supreme Court made clear that a plaintiff who has accepted a remitted award may not appeal that award. 429 U.S. at 649, 97 S.Ct. 835.

In sum, we have for review an "order of remittitur" which has neither been consented to nor rejected by property owners. In fact, if either of these two events had occurred, this case would not now be before us as there would be no appealable order.[13] It appears that property owners hoped to avoid a new trial and proceed to immediate appellate review of the reduction in punitive damages by failing to object to the district court's entry of judgment.

Jurisdiction in this court, however, may not be conferred by a party's silence. *Fitzgerald v. Seaboard System R.R.,* 760 F.2d 1249, 1251 (11th Cir.1985) ("Therefore, lack of jurisdiction cannot be conferred upon a federal court by consent, inaction or stipulation...."). If the Seventh Amendment continues to prohibit a federal court from "enter[ing] an absolute judgment for any other sum than that assessed by the jury," *Kennon,* 131 U.S. at 30, 9 S.Ct. 696, then the entry of judgment without property owners' consent was error and this case is due to be dismissed for lack of jurisdiction. Alternatively, if the reexamination clause is not implicated by the district court's entry of judgment in this case, the court was entitled to enter the judgment

---

[12]If property owners had consented to the reduced awards, the district court would have denied the motion for a new trial. Defendants may not appeal this denial. *State Nat. Bank of El Paso v. United States,* 488 F.2d 890, 893 (5th Cir.1974). It merges into the final judgment, however, which, of course, is appealable. Thus, the denial of a motion for new trial is reviewable on appeal of the final judgment. *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940); *Lloyd v. Gill,* 406 F.2d 585 (5th Cir.1969).

[13]Defendants, of course, could appeal the remitted amount as still excessive, but only after plaintiffs had *consented* to the remittitur and it became an *appealable* final judgment.

and we have jurisdiction over this appeal. Since the district court entered judgment under the authority of *BMW,* the resolution of this issue must lie in the interplay between *BMW* and the Seventh Amendment.

III.

At common law, no review of jury verdicts was permitted except upon writs of error, which were limited to questions of law. *Gasperini,* 518 U.S. at 452, 116 S.Ct. 2211 (citing 3 W. Blackstone, Commentaries on the Laws of England 405 (1768)). The Seventh Amendment incorporated this principle, forbidding any reexamination of a jury's determination of the facts. *Gasperini,* 518 U.S. at 452, 116 S.Ct. 2211. Neither common law nor the Seventh Amendment, however, prohibits reexamination of the verdict for legal error.[14] *Id.* Therefore, if legal error is detected, the federal courts have the obligation and the power to correct the error by vacating or reversing the jury's verdict. *Id.*

Similarly, where a portion of a verdict is for an identifiable amount that is not permitted by law, the court may simply modify the jury's verdict to that extent and enter judgment for the correct amount. *New York, L.E. & W.R. Co. v. Estill,* 147 U.S. 591, 13 S.Ct. 444, 454, 37 L.Ed. 292 (1893). In *Estill,* the Supreme Court determined that interest had been improperly awarded by the jury. The Court affirmed the jury's verdict as to the damages, but wrote that "it is not affirmed as to the amount of interest, or any part thereof, awarded by the verdict or judgment. That judgment is modified as to such interest, and the case is remanded to the court below, with a direction to enter a judgment for the plaintiffs for the [damages]...." *Id.* The Seventh Amendment is not offended by this reduction because the issue is one of law and not fact.

In *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 454, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), the Supreme Court held that the due process clause prohibits a state from imposing a "grossly excessive" punishment on a tortfeasor. Three years later, in *BMW,* the Court reversed a punitive damage award because it was unconstitutionally excessive. 517 U.S. at 562, 116 S.Ct. 1589. The Court held

---

[14]The Judiciary Act of 1789, 1 Stat. 73, also provides for "reexamin[ation]" of civil judgments upon a writ of error.

9

that the Constitution provides an upper limit on punitive damage awards so that a person has "fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose." *Id.* at 574, 116 S.Ct. 1589.

No one would dispute that the court, not the jury, has the responsibility for determining this constitutional limit. Courts decide questions of law, not juries. The real issue, therefore, is whether the court may enter judgment for a constitutionally reduced award without plaintiff's consent. So put, the question answers itself. Plaintiff's consent is irrelevant if the Constitution requires the reduction.

A constitutionally reduced verdict, therefore, is really not a remittitur at all.[15] A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages. The court orders a remittitur when it believes the jury's award is *unreasonable* on the facts. A constitutional reduction, on the other hand, is a determination that the law does not permit the award. Unlike a remittitur, which is discretionary with the court and which we review for an abuse of discretion, *Gasperini,* 518 U.S. at 435, 116 S.Ct. 2211, a court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause. *BMW,* 517 U.S. at 585, 116 S.Ct. 1589.

We conclude that, upon determination of the constitutional limit on a particular award, the district court may enter a judgment for that amount as a matter of law. Just as the Supreme Court struck the unlawful interest from the jury's verdict in *Estill* and ordered judgment entered for the remainder, so may the district court strike the unconstitutional excess from a jury's punitive damage award and enter judgment for that amount. As in *Estill,* the power to do so is located in the court's authority to enter judgment as a matter of

_____

[15]We find support for this view in the Supreme Court's failure to use the term remittitur in *BMW* to characterize a constitutionally required reduction in a verdict. Nowhere does the Court characterize such a reduction as a remittitur. On the other hand, the Court did specifically refer to the Fourth Circuit's reduction of the jury's verdict in *Hetzel* as a remittitur. While we do not imply that the characterization of a reduction is controlling as to the Seventh Amendment issue, we conclude that the nature of the reduction by the court does.

law.  Thus, a court proceeds under Rule 50, not Rule 59, in the entry of judgment for a constitutionally reduced award and the Seventh Amendment is not implicated in this legal exercise.[16]

We do not think *Hetzel* is to the contrary.  In *Hetzel,* the Supreme Court reversed the Fourth Circuit's writ of mandamus directing the district court to enter judgment for a *remittitur* without affording the plaintiff the option of a new trial.  118 S.Ct. at 1211.  It is clear that the Supreme Court viewed the reduction of the verdict in *Hetzel* as a traditional remittitur:  "In determining that the evidence did not support the jury's general damages award and in ordering the District Court to recalculate the damages, the Court of Appeals in this case imposed a remittitur."  118 S.Ct. at 1211.  There was no claim in the case that the Constitution required the reduction.  Therefore, the reduction must have been an exercise of the court's discretion.  As we have seen, the exercise of a court's discretion, under the authority of Rule 59, to propose a remittitur must afford the plaintiff the option to elect a new trial.[17]

---

[16]The court may enter judgment only if it reduces the jury's verdict to the maximum permitted by the Constitution in that particular case, as any smaller amount would invade the province of the jury.  *See Dimick,* 293 U.S. at 486, 55 S.Ct. 296 ("Where the verdict is excessive, the practice of substituting a remission of the excess for a new trial is not without plausible support in the view that what remains is included in the verdict along with the unlawful excess—in the sense that it has been found by the jury—and that the remittitur has the effect of merely lopping off an excrescence.").

[17]On remand of *Hetzel,* the Fourth Circuit explained that it had believed that after *Gasperini* and *BMW* "a substantial constitutional question had emerged as to whether the Court's decision in *Kennon* could be understood as controlling the disposition of the Seventh Amendment issue."  *In re Bd. of County Sup'rs of Prince William County, Va.,* 143 F.3d 835, 840 (4th Cir.1998).  The court read *BMW* to mean that the Seventh Amendment right to a jury would not be offended by the entry of judgment for a reduced verdict required by law—by any law, including state law.  *Id.*

      We agree with the Fourth Circuit that this issue is clouded by the statement in *Gasperini* that appellate review of a remittitur is permitted because a jury's verdict has an "upper limit [under state law], and whether that limit has been surpassed is not a question of fact with respect to which reasonable men may differ, but a question of law."  518 U.S. at 435, 116 S.Ct. 2211 (quoting *Dagnello v. Long Island R. Co.,* 289 F.2d 797, 806 (2d Cir.1961)).  This language implies that even a traditional remittitur is a matter of law, not discretion.  Whether state law remittiturs might ultimately be treated similarly to the constitutionally reduced verdict in our case, as the Fourth Circuit suggests, is a question that will, no doubt, be resolved as time goes by.  We do not address it because we have concluded that it is not raised by the constitutional reduction in our case.

11

We have concluded, however, that a constitutionally reduced award is not a traditional remittitur at all. It is not discretionary, and the court's authority to do so does not lie in Rule 59. Therefore, a constitutional reduction is not controlled by *Hetzel.*

It appears that the Tenth and the Second Circuits may not agree. *Continental Resources, Inc. v. OXY USA, Inc.,* 101 F.3d 634 (10th Cir.1996); *Lee v. Edwards,* 101 F.3d 805, 813 (2d Cir.1996). These courts have recently decided to continue to offer the plaintiff, whose verdict has been found to be constitutionally excessive,[18] a choice between a reduced verdict and a new trial to "avoid any conflict with the Seventh Amendment." *See OXY USA, Inc.,* 101 F.3d at 643. Some district courts, applying *BMW* have also permitted the plaintiff to elect a new trial. *See Mahoney v. Canada Dry Bottling Co.,* No. 94-CV-2924(FB) (E.D.N.Y. May 7, 1998); *Leab v. Cincinnati Ins. Co.,* No. Civ. A. 95-5690 (E.D.Pa. June 26, 1997); *Kim v. Dial Service Intern., Inc.,* No. 96 Civ. 3327(DLC) (S.D.N.Y. Aug. 11, 1997).

While the Constitution does not prohibit this cautious approach, neither does it require that we tread in the Tenth Circuit's footsteps.[19] When we hold a jury's verdict to be unconstitutionally excessive, we do not reexamine any facts; we merely adjust the verdict to the maximum the Constitution allows in that case.[20] No new trial need be offered as the Supreme Court itself recognized in *BMW* when it remanded the case to the Alabama Supreme Court to determine "[w]hether the appropriate remedy requires a new trial or *merely*

---

[18]It is not totally clear that the Second Circuit held the jury's verdict unconstitutionally excessive in *Lee. See Punitive Damages—Constitutional Excessiveness,* 12 No. 3 Fed. Litigator 84 (March 1997). If not, then the Second Circuit followed *Hetzel* in affording the plaintiff the opportunity to elect a new trial instead of consenting to a remittitur.

[19]Giving a plaintiff the option of a new trial rather than accepting the constitutional maximum for this case would be of no value. If, on a new trial, the plaintiff was awarded punitive damages *less* than the constitutional maximum, he would have lost. If the plaintiff obtained *more* than the constitutional maximum, the award could not be sustained. Thus, a new trial provides only a "heads the defendant wins; tails the plaintiff loses" option.

[20]Of course, if the district court exercises its discretion to reduce the verdict lower than the constitutional maximum for that case, the verdict has been "reexamined" and the plaintiff must be afforded the option to elect a new trial.

12

*an independent determination by the Alabama Supreme Court* of the award necessary to vindicate the economic interests of Alabama consumers...." 517 U.S. at 586, 116 S.Ct. 1589.[21]

In this case, the district court held that the $15 million punitive damage award was unconstitutionally excessive and entered judgments totaling $4.35 million. In effect, the court held the greater amount illegal and amended the jury's verdicts to conform to the law. We conclude, therefore, that the reexamination clause did not prohibit the district court from entering judgments for the amount of punitive damages it found to be constitutionally permitted without affording property owners an opportunity to elect a new trial. Accordingly, we hold that the district court correctly entered judgments in this case and that these judgments are properly before us for review.

IV.

Next, we consider whether the district court correctly determined the punitive damages permitted by the Constitution in this case.[22] Unless its award is at this constitutional "upper limit," it must be vacated.[23]

---

[21]It is unclear to us whether *BMW* allows an appellate court to determine the "upper limit" the constitution permits, or requires remand to the district court where the record is not so "cold." In the case of a remittitur under state law, a good argument can be made that *Gasperini* requires remand so that the district court can initially determine the appropriate award. 518 U.S. at 438, 116 S.Ct. 2211 ("Within the federal system, practical reasons combine with *Seventh Amendment constraints* to lodge in the district court, not the court of appeals, primary responsibility for application of [state law] check[s] on punitive damages")(emphasis added).

Such considerations are also present in the case of a constitutionally reviewed verdict. Indeed, the Supreme Court remanded both the *Gasperini* (excessive under state law) and the *BMW* (excessive under Constitution) verdicts to the lower courts for their redetermination of the damages. *Gasperini,* 518 U.S. at 439, 116 S.Ct. 2211; *BMW,* 517 U.S. at 586, 116 S.Ct. 1589.

[22]We are mindful of the difficulty of our task. *See* Justice Scalia's complaint that "[t]he Court has constructed a framework that does not genuinely constrain, that does not inform state legislature and lower courts—that does nothing at all except confer an artificial air of doctrinal analysis upon its essentially ad hoc determination that this particular award of punitive damages was not 'fair.' " *BMW,* 517 U.S. at 606, 116 S.Ct. 1589 (Scalia, J. dissenting). Nevertheless, *BMW* requires that we search for this "constitutional upper limit" when we review a due process challenge to a punitive damage award.

[23]Depending on the outcome of our inquiry, we would instruct the district court that on remand it must further reduce the award to the constitutional maximum for that case, or, if the present amount is below the constitutional limit, consider it a traditional remittitur and offer the plaintiff the option to elect a new

1.    *The Constitutional Analysis*

In *BMW,* the Supreme Court held that punitive damages may be so excessive as to be unconstitutional. The Court outlined a two-step process for determining when this has occurred. The first step is to marshal the facts which will inform our ultimate judgment regarding the constitutionality of the punitive damage award. Then, based upon these constitutionally relevant facts, we draw a legal conclusion as to whether the punitive damages awarded in the case are excessive.

The first step, then, is to identify the constitutionally relevant facts. The Supreme Court has instructed that punitive damages must be based upon conduct in a single state—the state where the tortious conduct occurred—and reflect a legitimate state interest in punishing and deterring that conduct. The Constitution also requires that the defendant had fair notice that its conduct could result in punitive damages and in the severity of the potential damages. *BMW* establishes three "guideposts" for determining whether the defendant had fair notice:

1)    the degree of reprehensibility of the defendant's conduct;

2)    the ratio of punitive damages to the actual harm inflicted on plaintiffs;  and

3)    the comparison between punitive damages and potential civil or criminal penalties for defendant's conduct.

*Id.* at 575, 116 S.Ct. 1589.

The district court in this case found that the conduct punished did occur in a single state and that this state—Georgia—has expressed a strong interest in deterring environmental pollution[24] and in protecting the rights of property owners "to have water flow upon [their] land in its natural state free from adulteration." *Kingsley Mill Corp. v. Edmonds,* 208 Ga. 374, 67 S.E.2d 111, 112 (1951). The court further found that:

---

trial.

[24]This interest is evidenced by Georgia's statutory scheme which provides that pollution of a stream is a trespass, O.C.G.A. § 51-9-7, and for civil penalties. O.C.G.A. § 12-5-52 (providing fines of up to $100,00 per day for violators of the Georgia Water Quality Control Act, O.C.G.A. §§ 12-5-20—12-5-53).

14

1)      "it is absolutely clear ... that the degree of reprehensibility [of CE's conduct] is not very severe;"

2)      the ratio of the punitive ($15 million) to the actual damages ($47,000) was 320:1;  and

3)      the ratio of the $15 million award to the administrative penalty imposed upon CE ($10,000) was 1500:1.

The district court concluded that an award of $15 million was "grossly disproportionate" to both the actual damages and the administrative penalty.  Since CE's conduct was "not very severe," the district court held that CE had no notice that such a disproportional amount might be awarded and, therefore, the punitive damage award was unconstitutionally excessive.  The court reduced the punitive damages awarded to $4.35 million, the maximum it believed the Constitution permits in this case.[25]

The parties disagree on the proper standard of review of this judgment under *BMW*.  Property owners argue that *BMW* requires a completely *de novo* review with absolutely no deference to any of the district court's findings.  CE correctly points out that a district court order granting or denying a remittitur under state law is reviewed for abuse of discretion, but acknowledges that "neither this Circuit nor any other federal court of appeals has articulated the standard for reviewing a punitive award under *BMW*."  The appropriate standard of review, therefore, is another issue of first impression for our consideration.

2.      *The Standard of Review*

Although the Seventh Amendment limits appellate review of state-law remittiturs to an abuse of discretion standard, *Gasperini,* 518 U.S. at 435, 116 S.Ct. 2211,[26] *BMW* makes clear that there is a

---

[25]The district court found that, under *BMW,* $4.35 million was the "appropriate assessment" of the punitive damages.  We interpret this language to mean the constitutional maximum.  Otherwise, the district court would have invaded the province of the jury by passing judgment not on the constitutionality of the award, but on its reasonableness.

[26]*Gasperini* was the first instance in which the Supreme Court approved the appellate review of a district court's denial of a motion to set aside the verdict as excessive.  518 U.S. at 434, 116 S.Ct. 2211. (As we have seen, the grant of such a motion results in a non-appealable order.)  The Supreme Court held that the Seventh Amendment limits the review to an abuse of discretion standard.

constitutional limit on a punitive damage award beyond which neither the jury nor the court has any discretion to venture. The abuse of discretion standard is inapplicable where no discretion may be exercised.[27]

The ultimate question whether a punitive damage award is constitutionally excessive is, of course, a legal issue. We review questions of law *de novo.* Therefore, whenever an award of punitive damages is asserted to have entered that "zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment," *BMW,* 517 U.S. at 568, 116 S.Ct. 1589, we review the award *de novo* under federal constitutional standards.[28]

In performing this review, however, we shall accept the district court's findings of fact unless they are clearly erroneous. Rule 52(a), Fed.R.Civ.P. *Cf. United States v. Bajakajian,* 524 U.S. 321, 118 S.Ct. 2028, 2037 n. 10, 141 L.Ed.2d 314 (1998) ("The factual findings made by the district courts in conducting the excessive[ ] [fines] inquiry, of course, must be accepted unless clearly erroneous."). For example, the ratio of the actual to the punitive damages is an historical fact. We accept that finding unless it is clearly erroneous.

As to the comparison between the punitive award and other civil or criminal sanctions that could have been awarded, the selection of the most appropriate point of comparison—actual fine imposed, the maximum possible penalty or penalties in similar cases—is an issue of law. We, therefore, review the district court's determination of the appropriate comparison *de novo.* However, the district court's finding regarding this comparison, i.e., the disparity between the amount of the punitive damages award and the amount of the other civil or criminal sanctions, is an historical fact which we review for clear error.

---

[27]As noted above, however, if the district court exercises its discretion to reduce a jury's verdict below the constitutional maximum, the plaintiff has a Seventh Amendment right to elect a new trial, and appellate review of that remittitur(after the second trial) must be for an abuse of discretion.

[28]On the contrary, if no constitutional challenge is mounted, then we review the district court's determination of whether an award is "within the confines set by state law" for an abuse of discretion. *Gasperini,* 518 U.S. at 435, 116 S.Ct. 2211.

Finally, the district court's determination of the reprehensibility of the CE's conduct is also ultimately factual. Although this determination must begin with the identification of the state's interest and an assessment of the strength of that interest—both legal questions requiring an interpretation of state law—the application of this legal standard to the facts of a particular case results in a finding of fact which we review for clear error.[29]

Although the "proper characterization of a question as one of fact or law is sometimes slippery," *see Thompson v. Keohane,* 516 U.S. 99, 110-11, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), the degree of reprehensibility of the defendant's conduct is essentially a judgment about facts. Such judgments are properly the role of the district court and we will not second guess the judge who sat through the trial, heard the testimony, observed the witnesses and had the "unique opportunity to consider the evidence in the living courtroom context" while we have only the "cold paper record." *See Gasperini,* 518 U.S. at 437, 116 S.Ct. 2211. When findings of fact are based on determinations about witnesses' credibility, the deference accorded the trial judge is even more significant "for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

This does not mean that we are without the power to reverse such judgments. If a district court's finding regarding the defendant's degree of reprehensibility is not supported by the record or is contrary to the evidence, it is "clearly erroneous." *See Anderson,* 470 U.S. at 573, 105 S.Ct. 1504. *BMW* instructs that there are several indicia of reprehensibility: deliberate false statements, acts of affirmative misconduct or concealment of evidence of improper motive, and repetition of tortious conduct. 517 U.S. at 576, 116 S.Ct.

---

[29]Similarly, a finding of negligence or gross negligence, each of which involves the application of a specific legal standard to a particular set of facts, has traditionally been deemed to be a finding of fact reviewed for clear error. *See Hale Container Line, Inc. v. Houston Sea Packing,* 137 F.3d 1455, 1471 (11th Cir.1998). *See also Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) ("Because a finding of intentional discrimination is a finding of fact, the standard governing appellate review of a district court's finding of discrimination is [clearly erroneous].").

17

1589. Thus, where a district court finds deliberate false statements, acts of affirmative misconduct or concealment of evidence of improper motive, and repetition of tortious conduct, but concludes, nonetheless, that the defendant's conduct was "not very reprehensible," a reviewing court would have ample authority to "set aside" this finding. Fed.R.Civ.P. 52(a). *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948) ( "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.").[30]

Review of a punitive damage award for constitutional error, therefore, requires first that we identify the state's interest in deterring the relevant conduct and the strength of that interest. Next, we review the district court's findings regarding the three *BMW* guideposts. To the extent that these are findings of fact, we review them for clear error. Finally, we determine *de novo* whether the punitive damage award is constitutionally excessive when measured by these guideposts.

In performing the latter assessment, the essential legal issue is whether the relevant facts of this case, as indicated by the various *BMW* factors, constitutionally support the punitive damage award, i.e., do these facts indicate that CE had adequate notice that its conduct might subject it to this punitive damage award. We will measure the adequacy of this notice by the degree of reprehensibility of CE's conduct, and the disparities between the actual damage it caused and the other available sanctions and the punitive damages that were ultimately awarded. In determining whether these disparities are constitutionally excessive, we will be informed by the strength of the state's interest in deterring CE's conduct.

V.

---

[30]On the other hand, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Anderson,* 470 U.S. at 574, 105 S.Ct. 1504 (citing *United States v. Yellow Cab Co.,* 338 U.S. 338, 342, 70 S.Ct. 177, 94 L.Ed. 150 (1949)).

First, we find no error in the district court's findings that the conduct punished here occurred in a single state and that the Georgia statutes express a strong interest in deterring environmental pollution. This interest would support a substantial punitive award. To determine the maximum punitive award permitted by the Constitution in this case, we turn now to the district court's findings on the notice CE had regarding its potential liability.

1.    *Reprehensibility of CE's Conduct*

The most important indicum of the reasonableness of a punitive damages award may be the degree of reprehensibility of the defendant's conduct. *BMW,* 517 U.S. at 575, 116 S.Ct. 1589. The relevant conduct of CE in this case involves only the four years preceding the filing of the property owners' complaint in August of 1992.[31] The evidence was that, during that time, the mining site was not operated by CE. CE reacquired the property in 1986 from Pasco, but never resumed mining operations.[32]

During the four years at issue, the district court found that CE put into effect a land reclamation plan, which was approved by the Georgia Environmental Protection Division, and which was designed to restore the property and prevent the problem of acidic rain water entering the streams flowing through its property. CE also cooperated with the Environmental Protection Division. Although its efforts were not entirely successful, the district court concluded that CE's "most egregious conduct was the failure to do more to prevent the acidic water problem."

The district court concluded that the degree of CE's reprehensibility was not great. Given the "developing" science of land reclamation which characterized the late 1980's, and CE's significant efforts in

---

[31]Where a trespass or nuisance is continuing in nature, an action may be maintained for all damages accruing during the four-year period preceding the filing of an action. O.C.G.A. § 9-3-30; *Tucker v. Southern Wood Piedmont Co.,* 28 F.3d 1089, 1091 (11th Cir.1994) (citation omitted).

[32]CE had mined the property prior to selling the property to Pasco which, in 1986, defaulted on its obligation to CE.

19

that regard, the district court held that there was not evidence in this case of "that high degree of culpability that warrants a substantial punitive damages award." *BMW*, 517 U.S. at 580, 116 S.Ct. 1589.

Although, under Georgia law, the jury must have found "specific intent to cause harm" to award punitive damages of this amount, the district court found that there was no direct evidence of such intent. The court concluded that the jury must have determined that CE's conduct exhibited a want of care rising to the level of conscious or deliberate indifference to the consequences of its actions. Specific intent to cause harm may properly be inferred from deliberate indifference, but the court concluded that CE's "deliberate indifference" did not constitute severe "reprehensibility" under *BMW*.

Furthermore, the district court found that none of the "aggravating factors associated with particularly reprehensible conduct," *BMW*, 517 U.S. at 576, 116 S.Ct. 1589, was present in this case. The district court found that:

> The evidence does not suggest that [CE] affirmatively engaged in prohibited conduct of any kind after it reacquired the property. It did not commit illegal acts, knowing or suspecting that the acts were illegal. In fact, [CE] responded to any criticisms or penalties levied against it by the Environmental Protection Division in a positive, more aggressive manner. Hence, there is no evidence that [CE] is a recidivist that continually repeats certain misconduct.

As there was ample evidence to support the district court's view of the evidence, we hold that its finding that CE's conduct was not highly reprehensible is not clearly erroneous.

2.      *Ratio of Actual to Punitive Damages*

Punitive damages must bear a "reasonable relationship" to actual damages. *BMW*, 517 U.S. at 580, 116 S.Ct. 1589 (collecting cases). If the ratio of actual to punitive damages is too great, it is an indication that the defendant did not have adequate notice that its conduct might subject it to an award of this size. *Id.* at 574, 116 S.Ct. 1589 ("Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose.").

20

In this case, property owners were awarded an aggregate of $47,000 in actual damages. The aggregate $15 million punitive award, therefore, was almost 320 times the amount of actual damage. The district court concluded such a ratio was constitutionally excessive because it approached the 500:1 ratio found "breathtaking" by the Court in *BMW*. 517 U.S. at 583, 116 S.Ct. 1589. The district court's reduction to an aggregate of $4.35 million represents a ratio of 100:1.

3.    *Civil or Criminal Sanctions for the Misconduct*

There may also be a lack of adequate notice if the difference between the civil or criminal penalties that were or could have been imposed and the punitive damage award is too great. *BMW,* 517 U.S. at 584, 116 S.Ct. 1589. In this case, Georgia law provides for civil fines of up to $100,000 per day for pollution of its streams. O.C.G.A. §§ 12-5-20—12-5-53. The statute is administered by the Georgia Environmental Protection Division. The only fine it actually imposed on CE for the conduct at issue in this case was $10,000.

The district court selected the $10,000 actual fine imposed as the most relevant "other sanction" for comparison with the punitive damage award as required by *BMW*'s third guidepost. We agree.

Whether a defendant had constitutionally adequate notice that his conduct might result in a particular damage award depends in large part upon the available civil and criminal penalties the state provides for such conduct. In *BMW,* the Court clearly stated that "a reviewing court engaged in determining whether an award of punitive damages is excessive should 'accord substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue." 517 U.S. at 583, 116 S.Ct. 1589 (citations omitted).

If a statute provides for a range of penalties depending on the severity of the violation, however, it cannot be presumed that the defendant had notice that the state's interest in the *specific* conduct at issue in the case is represented by the maximum fine provided by the statute.[33] On the contrary, the extent of the

---

[33]For example, the Court held in *BMW* that none of the statutes covering the relevant conduct in that case would have provided "fair notice [to BMW] that the first violation—or, indeed the first 14 violations—of its provisions might subject an offender to multimillion dollar penalty." 517 U.S. at 584,

defendant's statutory notice is related to the degree of reprehensibility of his conduct. For example, if the defendant had emptied a bottle of soda pop into a Georgia stream, it cannot reasonably be said that he was on notice he could be fined $100,000. Similarly, constitutionally adequate notice of potential punitive damage liability in a particular case depends upon whether this defendant had reason to believe that his specific conduct could result in a particular damage award.

The district court found that the degree of reprehensibility of CE's conduct was not severe. Furthermore, Georgia fined CE's conduct an amount far below the maximum permitted under its statute. The record reveals no indication that the $10,000 fine did not represent the strength of Georgia's interest in CE's conduct. Under these circumstances, the most relevant comparison under the third *BMW* guidepost is between the actual fine imposed and the punitive damage award. Where the state has actually imposed a penalty for the conduct at issue, the district court may choose to look to that penalty as an indication of the "legislative judgment" as to the "appropriate sanctions for the conduct at issue." *BMW,* 517 U.S. at 583, 116 S.Ct. 1589.[34]

The remitted punitive award of $15 million was 1500 times the amount of the $10,000 Georgia fine. The district court concluded that $15 million was "grossly disproportionate to the penalties that [CE] has suffered or has come to expect" and "would not comport with the fair notice requirements of the Constitution." The court's reduction of the punitive damages to $4.35 million represents an award 400 times greater than the actual civil sanction.

In sum, the district court found CE's conduct not very reprehensible, with no aggravating factors present. It found the $15 million punitive damage award to be 1500 times the administrative sanction

116 S.Ct. 1589.

[34]This is not to say that there may not be a case where the record reveals that the actual civil penalty imposed does not adequately reflect the state's interest in the specific conduct at issue in the case. In such a case, the court will have to decide whether to look at the maximum penalty permitted by state law or past penalties for similar conduct.

imposed and 320 times the actual damages found by the jury. The district court reduced the $15 million to an aggregate of $4.35 million, thereby reducing the relevant ratios to 400:1 and 100:1. We consider now whether the district court erred in holding that $4.35 million is the maximum amount of punitive damages the Constitution permits in this case.

VI.

A punitive damage award may not be "grossly out of proportion to the severity of the offense." *BMW,* 517 U.S. at 576, 116 S.Ct. 1589. We agree with the district court that the initial disparities in the relevant ratios were genuinely "shocking," and that $15 million in punitive damages was grossly excessive.

The reduction to $4.35 million also produced ratios which were gross enough to "raise a suspicious judicial eyebrow." *Id.* (quoting *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443 482, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993)). There is, however, no "mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." *Id.* (quoting *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 18, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)). In examining the ratio between the actual damages and the punitive award in a given case, a "general concern of reasonableness ... properly enter[s] into the constitutional calculus." *Id.*

The Supreme Court recognized in *BMW* that there would be times when a substantial disparity between actual damages and the punitive award would be expected and, therefore, not constitutionally excessive:

> Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.

517 U.S. at 582, 116 S.Ct. 1589.

This is such a case. The actual damages awarded were relatively small; yet the state's interest in deterring the conduct—environmental pollution—is strong. In order to achieve this goal, ratios higher than might otherwise be acceptable are justified. As Chief Judge Posner has noted:

23

[a] mechanical ratio, such as two to one or three to one or four to one or even ten to one, would not make good sense. The smaller the compensatory damages, the higher the ratio of punitive to compensatory damages has to be in order to fulfill the objectives of awarding punitive damages.

*Cooper v. Casey,* 97 F.3d 914, 919 (7th Cir.1996).[35]

Furthermore, in promoting deterrence, the economic wealth of a tortfeasor may be considered. *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 462 n. 28, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). A bigger award is needed to "attract the ... attention" of a large corporation. *OXY USA, Inc.,* 101 F.3d at 641. CE is a large and extremely wealthy international corporation. It is not unlikely that having to pay $4.35 million in punitive damages would not make the company newsletter.[36] It should, however, attract the attention of whomever is in charge of the corporation's daily decisions regarding environmental protection, and would, no doubt, bear heavily upon regional or local managers where failures to regard consequences would be expected to subject their employer to loss. The $4.35 million award is not so large, however, as to "implicate[ ] the federal interest in preventing individual States from imposing undue burdens on interstate commerce." *BMW,* 517 U.S. at 585, 116 S.Ct. 1589.

We conclude therefore, that substantial punitive damages are warranted for deterrence and, since the actual damages are quite small, must be somewhat disproportional to the actual damage award. The ratio of the district court's reduced award of $4.35 million to the administrative fine of $10,000 is significant, but the Georgia statutes provided fair notice to CE that it might be subject to a substantial penalty for pollution of the streams running though its property. The 100:1 ratio of the punitive to the actual damages is at the upper

---

[35]Another reason for a somewhat higher than normal ratio in this case is that, under Georgia law, property owners were forced to waive their claim for loss of market value in order to preserve their right to injunctive relief.

[36]Such a ratio might not be a direct deterrence to stockholders; it may not attract the attention of the board of directors. But it is not the act or omission of stockholders or directors that pollutes. The decision-maker on the scene whose conduct subjects the company to $4.5 million in damages is acutely aware that this loss affects the year-end reports of the department or division within which he works. An award sufficient to attract the attention of the department head in charge of the local decision-maker can be instrumental in deterring local disregard of the rights of others. In that sense, vast international corporations are made up of many smaller enterprises and deterrence of the small may be sufficient.

24

limits of the Constitution, but is justified by the need to deter this and other large organizations from a "pollute and pay" environmental policy. Under the circumstances of this case, then, $4.35 million in punitive damages is not so disproportional as to offend the "[e]lementary notions of fairness enshrined in our constitutional jurisprudence." *BMW,* 517 U.S. at 574, 116 S.Ct. 1589.

We hold, therefore, that $15 million was a constitutionally excessive punitive damage award in this case, and the district court correctly reduced it to $4.35 million, the maximum the Constitution permits in this case.

VII.

Two issues remain for our review. First, are property owners entitled to post-judgment interest on the original punitive damage judgments? Second, is CE entitled to a set-off of the amounts paid by it in settlement of some of the property owners' claims?

1. *Post-Judgment Interest*

The district court ordered interest on the punitive damages to run from June 9, 1997, the date it entered the reduced judgments totaling $4.35 million, rather than from June 16, 1994, the date of the original (remitted) judgments totaling $15 million. Plaintiffs assert that the district court erred in so doing.[37]

The determination of when interest begins to accrue on a money judgment is based on 28 U.S.C. § 1961 which provides:

> Interest shall be allowed on any money judgment in a civil case recovered in a district court.... Such interest shall be calculated from the date of the entry of the judgment....

The question in this case is when "the judgments" as to punitive damages were "entered". Was it on June 16, 1994, when the initial judgment of $15 million was entered, or was it on June 9, 1997 when the district court entered the reduced judgment of $4.35 million?

---

[37]CE argues that property owners waived this argument by not presenting it to the district court. This argument is without merit because "interest accrues from the date of a judgment whether or not the judgment expressly includes it, because 'such interest follows as a legal incident from the statute providing for it.' " *Tinsley v. Sea-Land Corp.,* 979 F.2d 1382, 1383 (9th Cir.1992) (citations omitted).

The law on this issue is clear. The Supreme Court has held that postjudgment interest compensates the successful plaintiff for being deprived of compensation for the loss from the time between the "ascertainment of the damage" and the payment by the defendant. *Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827, 835-36, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) (citing *Poleto v. Consolidated Rail Corp.,* 826 F.2d 1270, 1280 (3d Cir.1987)). Where the judgment is not supported by the evidence and is vacated and damages are determined by a new trial, the damages were not "ascertained" in any meaningful way until the entry of the second judgment. *Id.*

When an original judgment is not completely vacated, the date from which post-judgment interest runs turns on the degree to which the original judgment is upheld or invalidated. *Loughman v. Consol-Pennsylvania Coal Co.,* 6 F.3d 88, 98 (3d Cir.1993). Where the initial judgment is supported by the evidence and the later judgment merely reflects a remittitur of a certain portion of that judgment as excessive, the courts of appeals have routinely decided that damages were sufficiently "ascertained" at the time of the first judgment and that post-judgment interest should run from the date of the original judgment. *Dunn v. HOVIC,* 13 F.3d 58, 61 (3d Cir.1993); *Coal Resources v. Gulf & Western Industries,* 954 F.2d 1263, 1274-75 (6th Cir.1992); *Tinsley v. Sea-Land Corp.,* 979 F.2d 1382, 1383 (9th Cir.1992); *Masinter v. Tenneco Oil Co.,* 934 F.2d 67, 68 (5th Cir.1991); and *Affiliated Capital Corp. v. Houston,* 793 F.2d 706, 709 (5th Cir.1986).

These courts have reasoned that a remittitur merely reduces the damages by a distinct amount easily determined from the facts of the case. *Coal Resources,* 954 F.2d at 1275. The initial judgment is viewed as correct to the extent it is permitted to stand, and interest on a judgment partially affirmed should be computed from the date of its initial entry. *Tinsley,* 979 F.2d at 1383.

We think this reasoning is especially applicable in the context of a constitutionally excessive verdict. The jury's punitive damage awards were correct to the extent of $4.35 million. The clearly identifiable excessive portion has been stricken, but the remaining portion is just as clearly identifiable. Accordingly, this case is governed by the rule that post-judgment interest runs from the date that damages are clearly

26

ascertained, which, to the extent of the $4.35 million we affirm today, was the date of entry of the initial judgment—June 16, 1994.[38]

2.    *Set-off*

Finally, with respect to CE's claim to a right of set-off with regard to the amount paid by it in settlement of three of the plaintiffs' claims, CE cites no supporting authority and we can find none. Furthermore, the settlement agreements recite that "no part of the settlement amounts" be considered punitive damages. Having determined that punitive damages totaling $4.35 million do not offend the Constitution, we find no reason to set off any amounts CE has already paid in settlement.[39]

VIII.

We hold that the Constitution permits punitive damages in this case totaling $4.35 million. Post-judgment interest on the punitive damages accrues from the date these damages were ascertained, which, on the amounts we affirm today, was on June 16, 1994. CE enjoys no right to a set off of amounts paid by it in settlement of property owners' judgments.

Accordingly, the district court's judgment in each case is AFFIRMED; VACATED as to the date of accrual of post-judgment interest which shall run from June 16, 1994; and REMANDED.

---

[38]We also reject CE's argument that the district judge took into account his intention not to permit interest to date back to 1994 in determining the maximum constitutionally permissible punitive damages in this case. Even if he did, we do not believe that the statute permits the discretion to start the accrual of interest at some time other than when damages are "ascertained."

[39]The court has received some correspondence indicating that a settlement may have been reached with some of the remaining ten plaintiffs (or groups of plaintiffs). Any further settlements and dismissals of individual plaintiffs would, of course, result in the removal of that judgment from the case. As the district court applied a multiplier of 100 to each plaintiff's compensatory award to arrive at his constitutionally appropriate punitive award, resulting in the aggregate award of $4.35 million, the elimination of that plaintiff's individual judgment would result in a proportional reduction of the aggregate punitive damages awarded and, therefore, in a corresponding reduction in the relevant ratios. Thus, our holding today would also remain applicable.